UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

FRANKLIN M. GOLDMAN,            )
    Petitioner              )
                           )
                           )
v.                             )    C.A. No. 04-12712-MLW
                           )
DAVID L. WINN, WARDEN,         )
UNITED STATES OF AMERICA,      )
    Respondents             )

MEMORANDUM AND ORDER

WOLF, D.J.                                          July 1, 2008

I.   SUMMARY

In 1993, petitioner Franklin Goldman was convicted in this federal court of conspiracy to possess cocaine with intent to distribute and possession of cocaine with intent to distribute. Ordinarily, the Guideline range for Goldman's offenses would have been 121 to 151 months.[1]  If Goldman had been sentenced in 1993 to 121 months in custody, he would have been released no later than August 15, 2002.  If he had been sentenced to 151 months in custody, he would have been released no later than February 15, 2005.

However, a defendant with at least two felony convictions

---

[1]The May 23, 2008 and June 24, 2008 memoranda from the Probation Office on which the calculations relating to Goldman's sentence are based are being provided to the parties today pursuant to a separate Order.  The parties will have an opportunity to address these calculations in connection with the resentencing that is being scheduled.

1

for either a crime of violence or a controlled substance offense was classified as a Career Offender and had an increased Guidelines range. See U.S.S.G. §4B1.1. In 1993, Goldman had two such convictions. Therefore, the Guideline range for his sentence was 360 months to life. In 1993, the late Judge A. David Mazzone sentenced Goldman, who was then forty-nine years old, to 360 months – thirty years – in prison. Thus, Goldman's status as a Career Offender added seventeen to twenty years to his sentence.

In 1993, Goldman had only two prior convictions that qualified for Career Offender purposes. One was a 1977 conviction in the Massachusetts Superior Court for the alleged kidnapping of Jeffrey Lopes. Goldman and two co-defendants, Francis Larkin and Ralph Mondello, were convicted in a non-jury trial by Superior Court Justice Vincent R. Brogna. Goldman was given a five to ten year sentence to be served concurrently with another sentence that he was then serving. Therefore, in 1977, the sentence imposed in the kidnapping case had no consequences for Goldman.

Nevertheless, in 1977 Goldman attempted to appeal his conviction and sentence. However, Justice Brogna denied his requests for appointment of counsel and for a transcript of the

trial.   In the absence of a transcript, Goldman's appeals were dismissed without ever being reviewed on their merits.

After the 1977 kidnapping conviction had dramatic consequences for the federal sentence imposed on Goldman in 1993, he promptly sought to have a series of four attorneys move to vacate that conviction in state court.   Despite Goldman's efforts, it was not until 2000 that a motion for a new trial was filed on his behalf.   In 2001, that motion was granted and Goldman's 1977 conviction was vacated.   In 2002, the state decided not to retry Goldman.

In 1994, the Supreme Court had held that a defendant or prisoner who wished to challenge a state conviction that resulted in a federal sentencing enhancement could not do so in a federal sentencing proceeding.   Custis v. United States, 511 U.S. 485 (1994).[2]   Rather, the Supreme Court indicated that the proper procedure would be to move to vacate the state sentence in state court and, if successful, "apply for reopening of any federal sentence enhanced by the state sentence[]." Id. at 497.

Therefore, the vacatur of the kidnapping conviction in 2001 would ordinarily have made Goldman eligible for resentencing and

_____

[2] Earlier in 1994, the First Circuit, in United States v. Isaacs, 14 F.3d 106 (1st Cir. 1994), had anticipated the Supreme Court's decision in Custis.

3

for a substantial reduction of his sentence that could have resulted in his immediate release. Recognizing this, Goldman promptly filed in 2002 a motion to reopen his federal sentencing in accordance with the prescription in <u>Custis</u>. Such motions are now relatively common and generally result in a reduction of a federal sentence after a material state court conviction has been vacated.

At this point, however, Goldman and the courts confronted a complex series of procedural issues. By 2002, Goldman had unsuccessfully appealed his 1993 federal conviction. In 1995, prior to the enactment of the Anti-Terrorism and Effective Death Penalty Act ("AEDPA") in 1996, Goldman also filed an unsuccessful motion pursuant to 28 U.S.C. §2255 to correct his sentence. Evidently recognizing that <u>Custis</u> indicated that challenges to state convictions must first be successfully made in state court, Goldman's 1995 §2255 motion did not challenge his Career Offender status. Prior to AEDPA there was no bar on filing a second, successive §2255 motion. Therefore, when he filed his §2255 motion Goldman would have reasonably expected to have been able to challenge his Career Offender status in a second §2255 motion if he later succeeded in getting his 1977 conviction for kidnapping vacated. However, in 1996 AEDPA, among other things,

4

imposed a one-year statute of limitations on §2255 motions and prohibited federal prisoners from filing second or successive §2255 motions except in very limited circumstances.

Although Goldman styled his 2002 submission as a motion to reopen his 1993 federal sentencing as <u>Custis</u> instructed, Judge Mazzone construed it as a second or successive §2255 motion which could not, under AEDPA, be considered without leave of the First Circuit.  The First Circuit subsequently denied Goldman leave to file a second §2225 motion because he had not made a prima facie showing that he had newly discovered evidence which, if credible, would establish by clear and convincing evidence that no reasonable factfinder would find him guilty of the drug crimes for which he was convicted in federal court in 1993.

Therefore, in 2004, Goldman filed the instant petition pursuant to 28 U.S.C. §2241.  Section 2241 empowers the federal courts to hear and grant petitions for writs of habeas corpus, and provides an equitable remedy to federal prisoners in very limited circumstances when §2255 is inadequate or ineffective to challenge their detention.  The First Circuit has not decided all issues concerning when §2241 is available to federal prisoners. However, it has repeatedly emphasized that a claim of actual innocence will have a mechanism for review, including under §2241

if §2255 is unavailable.  The standard for demonstrating actual innocence has been developed in the procedural default context, where courts recognize that a meritorious showing of actual innocence permits collateral review of claims otherwise defaulted by a petitioner's failure to raise them earlier.  It is a very high standard.  It is rarely met.  However, this is one of those rare cases.

Here, the government argues that even if Goldman is permitted access to §2241, his claims are procedurally defaulted because he did not raise them in an earlier proceeding and are barred because he did not pursue vacatur of his state court conviction with sufficient diligence.  The court finds, however, that Goldman was sufficiently diligent in seeking to vacate his 1977 conviction after it had consequences for his federal sentence.  Nevertheless, his claims would ordinarily be procedurally defaulted because of his failure to challenge his 1977 conviction during his 1993 federal sentencing hearing. However, his clear and convincing showing of actual innocence excuses this default.

After many hearings focusing primarily on the challenging procedural issues in this case, in 2007 Goldman obtained crucial new evidence of his actual innocence of the purported 1975

kidnapping of Lopes.  That evidence was tested at a March, 2008 evidentiary hearing.  The court finds that evidence to be credible and compelling.  It provides clear and convincing proof that no fully informed reasonable juror would have convicted Goldman of kidnapping Lopes.  Therefore, Goldman is entitled to be resentenced for his 1993 federal conviction without regard to that conviction.

As explained in detail in §III(C)(2), _infra_, although there is no transcript of the 1977 state trial, the relevant police reports indicate that the critical witness was Jeffrey Lopes, the purported victim of the kidnapping.  He claimed to have been kidnapped from the Stadium Cafe by three men, who demanded that his father, an incarcerated associate of La Cosa Nostra Boss Raymond Patriarca, pay money to them to protect Lopes and his family from harm.  Lopes and other witnesses identified Larkin and Mondello as two of the three men who came to the Cafe. Investigation demonstrated that Lopes was transported in vehicles rented by Larkin and Mondello.  Larkin was arrested at the place where the payment for Lopes' protection was to have been made. Larkin was also identified as being in the motel where Lopes was taken after Mondello's own vehicle was disabled in a snow storm, and Larkin's fingerprint was found there.

In the police reports, Goldman is not identified by anyone as being at the Cafe or motel. He is identified by two service station operators as a person who dealt with them concerning the disabled vehicle.

The court assumes that Lopes identified Goldman at trial as one of his kidnappers. However, the contemporaneous records indicate that Goldman was impermissibly shown to Lopes and other witnesses prior to the jury-waived trial before Justice Brogna. Francis O'Boy, the former Assistant District Attorney who prosecuted Goldman, Mondello, and Larkin, characterized Lopes as a "despicable" person.

Therefore, the evidence that Goldman was involved in the purported 1975 kidnapping of Lopes was weak at the time he was tried in 1977. Significant, new exculpatory evidence was presented at the March, 2008 evidentiary hearing in this matter. First, Ralph DeLeo, an associate of Goldman, Mondello, and Larkin in the 1970s, credibly explained that he was the third person involved in the purported kidnapping of Lopes. According to DeLeo, Lopes owed a substantial debt. Harvey Brower, a criminal defense lawyer associated with Patriarca who later became a federal felon, arranged with Lopes a phony kidnapping to extort money from Lopes' father which would be used to settle Lopes'

8

debt.   DeLeo participated in that scheme with Mondello and Larkin.   Before the 1977 trial, DeLeo told Jack Zalkind, the attorney representing Goldman and Mondello, that he, rather than Goldman, had been involved.   Zalkind testified in this case and confirmed this.

Mondello, who has had a genuine epiphany and would regard it as a "grave sin" to lie, also testified and confirmed DeLeo's account.   He explained that he had called Goldman to assist with his disabled vehicle and that Goldman had no other involvement in the phony kidnapping of Lopes.   Goldman's testimony was consistent with Mondello's.

The evidence presented to this court provides clear and convincing proof that no fully informed reasonable juror would have convicted Goldman of the purported kidnapping of Lopes. Therefore, the conviction for that offense which in 1993 resulted in an additional seventeen to twenty years being added to Goldman's federal sentence has caused a true miscarriage of justice for which §2241 provides an avenue for relief.   Because serious errors at his 1977 trial led to the loss of Goldman's direct appeal and to the subsequent vacating of the 1977 conviction, Goldman's claim for relief under §2241 is meritorious.

9

Accordingly, Goldman's petition for relief is being granted. The court will resentence Goldman.  He has already served an extra three to six years because of his 1977 conviction for kidnapping.  Thus, the court expects to order Goldman's immediate release.  The court is, however, providing the government an opportunity to move for a stay of that foreseeable order prior to the resentencing hearing.

II.  PROCEDURAL HISTORY

A.  Goldman's 1977 State Court Conviction

On February 17, 1976, Goldman and two codefendants, Mondello and Larkin were charged in Bristol Superior Court of the Commonwealth of Massachusetts with kidnapping and attempt to commit a crime, extortion.  See United States v. Goldman, Cr. No. 92-10229-ADM, Presentence Report ("PSR") at ¶¶67, 69; Ex. 4 (Bristol County Docket).  The charges arose from the alleged kidnapping by three men of Jeffrey Lopes from the Stadium Cafe in New Bedford, Massachusetts on November 24, 1975.

After a jury trial ended in a mistrial, the case proceeded to a jury-waived trial before Justice Brogna.  Bristol County Docket Jul. 26, 1977 ("Deft.'s Waiver of Trial by Jury").  Justice Brogna found Goldman and his codefendants guilty.  Id. Aug. 5, 1977 (Court Finding of Guilty, Brogna, J.).  Goldman was

sentenced to not more than ten or less than five years in prison to run concurrently with a sentence that Goldman was already serving on a separate conviction. <u>Id.</u> Aug. 5, 1977 (Sentence); PSR ¶69. Justice Brogna's sentence did not extend the time in which Goldman would be in custody.

Because the concurrent sentence had no practical effect at the time, Goldman's attorney, Zalkind, advised him not to appeal. Mar. 18, 2008 Transcript ("Tr.") at 30 (Test. of Zalkind). Despite this advice, Goldman promptly made numerous <u>pro</u> <u>se</u> filings attempting to appeal Justice Brogna's finding of guilt and sentence. <u>See Pro Se</u> Claim of Appeal, Bristol County Docket Aug. 12, 1977; Appeal from Sentence, <u>id.</u> Aug. 15, 1977; Motion to Revoke and Revise, <u>id.</u> Aug. 26, 1977; Motion for Free Transcripts, <u>id.</u> Sept. 28, 1977; Petition for a Writ of Habeas Corpus ad Testificandum, <u>id.</u> Sept. 28, 1977; Motion for Appointment of Counsel, <u>id.</u> Sept. 28, 1977.

Justice Brogna denied nearly all of Goldman's motions, including his motion for transcripts and for appointment of counsel, without a hearing. <u>Id.</u> Oct. 19, 1977. Justice Brogna explained that the motion for counsel was being denied because Zalkind had not been allowed to withdraw, and that his Motion for Transcripts was being denied because:

11

> The defendant's attorney of record has not asked for a transcript. Furthermore, I consider the claim of appeal to be completely frivolous. The evidence at trial, which took two weeks, was overwhelming against Mr. Goldman. Furthermore, he was apprehended by the police at the place where the supposed ransom money was to be dropped off.

Ex. 21 (Letter from J. Brogna to Clerk, Oct. 14, 1977) at 1. It is evident that in this ruling Justice Brogna was confusing Goldman with his co-defendant Larkin, who was the only person apprehended on November 25, 1975, at the place where the ransom money was to have been left. See infra §II(C)(2). Goldman was not arrested until over a month later.

On November 10, 1977, Justice Brogna allowed Zalkind to withdraw as counsel, but took no action on Goldman's prior motion for appointment of counsel. Bristol County Docket, November 10, 1977. In 1981, the Massachusetts Appellate Division dismissed the appeal of Goldman's sentence, but did not act on his Claim of Appeal, which challenged his conviction. Bristol County Docket Jan. 19, 1981. Goldman never received direct appellate review of his 1977 conviction, despite his timely filing of a claim of appeal in the trial court.

B.  Federal Conviction and Sentence

Fifteen years later, Goldman was convicted by a jury in this federal court of one count of conspiracy to possess cocaine and

one count of possession of cocaine with intent to distribute. See United States v. Goldman, 92-10229-ADM, Docket No. 91 (Clerk's Notes of Verdict Returned); United States v. Goldman, 41 F.3d 785, 785-86 (1st Cir. 1994) ("Goldman I") (affirming conviction). Goldman's prosecution and conviction arose after he provided cocaine to an associate who, in tape recorded conversations, had agreed to sell the cocaine to an undercover agent. See Goldman I, 41 F.3d at 786.

On April 24, 1993, Judge Mazzone sentenced Goldman to 262 months, or almost twenty-two years, in prison on the drug charges. See id. For reasons not relevant to this proceeding, three days later Judge Mazzone conducted another hearing and corrected this sentence to 360 months, or thirty years, in prison.[3] See id. In both instances, Goldman was sentenced as a Career Offender under U.S.S.G. §4B1.1, which increases the applicable sentencing range when, among other things, an offender's record includes "at least two prior felony convictions for either a crime of violence or a controlled substance

---

[3] The correction was required because, at the original sentencing hearing, neither the government nor the court recognized that Goldman had a prior federal drug felony conviction, which increased the statutory maximum for his sentence and, therefore, the applicable sentencing range. See Goldman I, 41 F.3d at 788-89; United States v. Goldman, No. 92-10229-ADM, Apr. 27, 1993 Sentencing Transcript.

offense."  Id.; U.S.S.G. §4B1.1.

In 1993, Goldman had two such convictions -- his 1977 Bristol County conviction for Kidnapping and Attempted Extortion and a 1976 Suffolk County conviction for Armed Robbery and Attempted Kidnapping.  See Goldman 1993 Presentence Report at ¶¶79, 68 and 70.[4]  Goldman's classification as a Career Offender increased the Guidelines Range for his sentence by seventeen to twenty years.  Goldman I, 41 F.3d at 789; Presentence Report (Third Addendum) ¶4.

The sentence of 360 months was the minimum sentence permitted under the Guidelines once the Career Offender enhancement was applied.  Goldman I, 41 F.3d at 789.  Without the Career Offender enhancement, the Guidelines range applicable at the 1993 sentencing would have been 121 months to 151 months, or about ten to thirteen years.  If he had been sentenced at the low end of this range, Goldman would have been released no later than

_____

[4] Although, as just discussed, Goldman also had a prior federal drug felony conviction, Goldman was convicted on that charge in 1971 and released from prison on that charge in 1975, see PSR ¶64, making this conviction too old under U.S.S.G. §4A1.2(e) for use in Career Offender calculations.  See U.S.S.G §4B1.2, cmt n.3 (noting that §4A1.2's limits on the use of convictions in criminal history calculations (including §4A1.2(e)'s time limits) are applicable to the counting of convictions to determine Career Offender status).  Goldman also had prior state convictions for drug possession and armed robbery that were also too old to be counted.  See PSR ¶¶60-61.

August 15, 2002.  If sentenced at the higher end of the range, he would have been released no later than February 15, 2005.  Under his current, enhanced sentence, Goldman will not be eligible for release before September, 2018.

C.  Prior Challenges to Federal Conviction and Sentence

In his direct appeal of his 1993 conviction and sentence, Goldman raised various issues that are unrelated to the claim he presents here.  See Goldman I, 41 F. 3d 785 (considering Goldman's challenges to the search of his car trunk, impeachment evidence, and the correction of his sentence).  Goldman's allegations of error were found to be unmeritorious and his conviction was affirmed.  Id. at 789.  The Supreme Court denied Goldman's petition for certiorari on March 6, 1995.  See United States v. Goldman, 514 U.S. 1007 (1995).

From 1995 to at least 1999, Goldman filed a series of post-conviction motions attacking his 1993 conviction, including a §2255 motion and two motions for relief from the final judgment denying his §2255 motion.  On April 28, 1995, Goldman filed his first motion to vacate or correct his sentence under 28 U.S.C. §2255.  See C.A. No. 95-10989 Docket Entry 1.  Judge Mazzone denied Goldman's §2255 motion and later denied his request for a certificate of appealability.  See id. Sept. 3, 1996; Feb. 24,

15

1997 Docket Entries.   The First Circuit also refused to certify an appeal, and also denied Goldman's petition for rehearing en banc and his motion to reinstate appeal.   See id. Docket No. 22; First Circuit, Case No. 97-1018.

Goldman then requested relief from final judgment, under Federal Rule of Civil Procedure 60(b), in the District Court, filing both a pro se motion on July 25, 1997 and an amended motion on March 4, 1998 with counsel.   See C.A. No. 95-10989 Docket Entries.   The amended motion was styled as a motion for relief from the final denial of the §2255 motion.   Judge Mazzone denied this motion.   See C.A. No. 95-10989 Sept. 29, 1999 Mem. and Order.   Goldman's attempt to appeal that decision was denied on September 14, 2000.   See C.A. No. 95-10989, September 14, 2000 Docket Entry (reporting First Circuit Order).

D.   Challenge to 1977 State Conviction

After his federal sentence was imposed in 1993, Goldman was aware of the impact of the 1977 conviction on that sentence. Almost immediately, he wrote Zalkind, his defense counsel at the 1977 kidnapping trial, to inform him of his federal sentence and inquire about the frustration of his effort to appeal his conviction in 1977.   See Mar. 18, 2008 Tr. at 31; Ex. 5 (July 20, 1993 Letter from Zalkind in response to Goldman's letter to him).

16

While his federal case was on direct appeal in 1993 and 1994, Goldman asked his court-appointed appellate counsel, Dana Curhan, if Curhan could challenge the 1977 conviction either in Goldman's direct appeal or in a state court motion to vacate that conviction.  See Mar. 18, 2008 Tr. at 99-102 (Test. of Curhan); Mar. 19, 2008 Tr. at 84 (Test. of Goldman).  Curhan declined.  He believed that challenging the conviction in the federal appeal was not permissible because only the state court could vacate that conviction and attempting to vacate the conviction in state court was beyond the scope of his appointment.  Id. Mar. 18, 2008 Tr. at 100-02 (Test. of Curhan).

In approximately 1996, after Goldman's direct appeal and first §2255 motion had been denied, he contacted a private criminal defense attorney, Martin Leppo, and asked him to try to vacate his 1977 conviction.  Mar. 19, 2008 Tr. at 88 (Test. of Goldman).  Leppo initially agreed to look into the possibility of vacating the Bristol County conviction.  Id.  Leppo reviewed files Goldman sent him over an eighteen-month period.  Id. at 89-90; Ex. 22 (Aug. 27, 2002 Aff. of Martin Leppo).  However, because Goldman was not able to raise the funds necessary to hire him, Leppo took no action to attempt to vacate the 1977 conviction.  See Mar. 19, 2008 Tr. at 88 (Test. of Goldman); Ex.

17

22 (affirming that after an eighteen-month period of communication, Goldman could not work out the financial arrangements with Leppo).

In about 1997, Goldman attempted to retain another attorney, James Creedon, to challenge the 1977 conviction. Mar. 19, 2008 Tr. at 91 (Test. of Goldman). This effort too was unsuccessful.

In 1998, Goldman's family hired an attorney for Goldman, Kevin O'Dea. See Mar. 18, 2008 Tr. at 85 (Test. of O'Dea); Mar. 19, 2008 Tr. at 91-92 (Test. of Goldman). In 1998 and 1999, O'Dea prepared to file a motion for a new trial in the state court. See Mar. 18, 2008 Tr. at 84-87.

On April 14, 2000, O'Dea filed a motion in Bristol Superior Court for a new trial on the Lopes kidnapping charge on the grounds that Goldman had been improperly denied a direct appeal of his 1977 conviction. See Ex. 8 (Bristol Superior Court New Trial Motion). The motion was heard by Bristol Superior Court Justice Daniel F. Toomey, who found it meritorious. See Ex. 9, Commonwealth v. Goldman, Nos. 54316, 54318 at 7 (Mass. Sup. Ct. October 15, 2001).

In granting Goldman's motion for a new trial, Justice Toomey described the issue before him as "the vexing question of the remedy, if any, for the defendant's faultless loss of his right

18

to appellate review of his [1977] conviction." _Id._ at 3.
Justice Toomey noted that, following his 1977 conviction, Goldman
had filed _pro se_ motions for transcripts and for appointment of
counsel, and a timely _pro se_ claim of appeal, but that these
motions were all denied by Justice Brogna in 1977 in part because
he "consider[ed] the claim of appeal to be completely frivolous."
_Id._ at 2, 3.

> Justice Toomey concluded:
>
> defendant's predicament is that, through no fault of
> his own and contrary to his wishes expressed
> consistently since the time of this conviction, he
> cannot be afforded the appellate review to which he
> was, and is, entitled.
>
> Under these circumstances, "justice may not have been
> done," Mass. R. Crim. P. 30(b), and a new trial is an
> appropriate, and perhaps the only, way to ensure that
> the interests of justice – the defendant's personal
> interest _and_ the Commonwealth's institutional interest
> - are realized.

_Id._ at 4-5.

By 2001, a transcript of the 1977 trial could not be
prepared. Justice Brogna's 1977 decision denying Goldman's
request for a transcript made a record of the state trial
unavailable and thus prevented the reinstatement of Goldman's
appeal. _Id._ at 4. Therefore, Justice Toomey granted Goldman's
motion for a new trial. _See id._ at 4-7. State prosecutors later
dismissed the case citing the insufficiency of the available

19

evidence after twenty-five years.  <u>See</u> Sept. 5, 2002 Dismissal by
Prosecution (Pet. Ex. 9).

E. <u>Challenge to Federal Sentence Based on Vacatur of State
Conviction</u>

Goldman's initial §2255 motion and motions for relief from
judgment did not challenge his federal Career Offender
enhancement based on the alleged invalidity of his 1977
conviction.  <u>See</u> <u>generally</u> C.A. No. 95-10989 Sept. 29, 1999 Mem.
and Order (describing the §2255 and Rule 60(b) motions, which
challenged various aspects and consequences of the government's
threat to use prior bad act evidence at trial to impeach
Goldman).  There was good reason for this.

Prior to the filing of Goldman's first §2255 motion in 1995,
the Supreme Court had explained in <u>Custis</u>, that a federal
petitioner seeking to challenge a sentence enhancement based on a
predicate state conviction should first attack that conviction in
state court and, <u>only after he is successful there</u>, "apply for
reopening of any federal sentence enhanced by the state
sentence."  511 U.S. at 497.  Following <u>Custis</u>'s direction,
Goldman and his attorney were evidently reserving a possible
challenge to his Career Offender enhancement until after Goldman

sought and received vacatur of his 1977 kidnapping conviction in state court.[5]

This approach was reasonable because Goldman's §2255 motion was filed before the April 24, 1996 passage of AEDPA.  Therefore, Goldman, and later his attorney, would have reasonably believed that Goldman could move to reopen his federal sentencing by filing a second §2255 motion if and when he vacated his 1977 conviction.  However, AEDPA, among other things, imposed a one-year statute of limitations on §2255 motions and prohibited federal prisoners from filing second or successive §2255 motions except in very limited circumstances.  See 110 Stat. 1214 §105 (codified at 28 U.S.C. §2255(f)-(h)).  AEDPA's limit on second motions had the effect, until now, of depriving Goldman of access to the relief contemplated by the Supreme Court in Custis.

On February 12, 2002, within one year of the state court decision granting him a new trial, Goldman moved in federal court to reopen his 1993 federal sentencing.  See Goldman v. United States, C.A. No. 95-10989 (D. Mass. April 5, 2002) ("Mazzone Denial of Mot. to Reopen Sentence") at 2.  As described earlier,

---

[5] Goldman filed his §2255 motion pro se in 1995.  See C.A. No. 95-10989, April 28, 1995 Docket Entry.  He subsequently obtained counsel, who filed an amended memorandum in support of the motion in November, 1995.  Id. July 10, 1995, November 13, 1995 Docket Entries.

this was the course of action the Supreme Court in <u>Custis</u> indicated would be appropriate if a state sentence had been vacated. <u>See</u> <u>Custis</u>, 511 U.S. at 497. However, Judge Mazzone construed Goldman's motion as a second or successive §2255 motion, which under AEDPA could not be considered without the leave of the First Circuit. Mazzone Denial of Mot. To Reopen Sentence at 3. The Court of Appeals affirmed. <u>Goldman v. United States</u>, C.A. No. 02-1593 (1st Cir. Oct. 21, 2002) ("<u>Goldman II</u>").

Accordingly, Goldman sought leave from the First Circuit to file a second §2255 motion. <u>Goldman v. United States</u>, C.A. No. 02-2322 (1st Cir. Nov. 7, 2002) ("<u>Goldman III</u>"). The First Circuit denied leave to file, explaining that, under AEDPA, Goldman was required to "make a prima facie showing that his present §2255 motion contains 'newly discovered evidence that, if proven and viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that no reasonable factfinder would have found the movant guilty of the offense.'" <u>Id.</u> (quoting 28 U.S.C. §2255(h)(1)). Since Goldman claimed innocence of a state crime that operated to enhance his sentence rather than innocence of the crime that constituted his federal conviction, the First Circuit found him ineligible under AEDPA to file a second §2255 motion. <u>Id.</u>

Barred from proceeding pursuant to §2255, Goldman next filed the instant §2241 petition on December 27, 2004.[6]

III. ANALYSIS

A. Goldman's Claim

Ordinarily, a petitioner who has had his sentence enhanced based on a prior conviction which is later vacated is entitled to a reduction of his sentence. See Johnson v. United States, 544 U.S. 295, 303 (2005) (noting that Supreme Court cases applying the Career Offender and Armed Career Criminal federal enhancement provisions "assume . . . that a defendant given a sentence enhanced for a prior conviction is entitled to a reduction if the earlier conviction is vacated"); In re Davenport, 147 F.3d 605, 609 (7th Cir. 1998) (attack on the validity of a Career Offender enhancement goes "to the fundamental legality of [the] sentence"); Mateo v. United States, 398 F.3d 126, 134 & nn.6-7 (1st Cir. 2005) (citing cases that have permitted collateral attacks on federal sentences following state court vacatur of predicate convictions that underlay Sentencing Guidelines enhancements); id. at 133 (affirming allowance of §2255 motion

_____

[6] At the time Goldman filed his §2241 petition, counsel for him and for the government were not aware of Goldman's prior motion for leave to file a second §2255 motion. Therefore, some arguments made in early submissions in this case were rendered moot by the discovery of Goldman's prior motion for leave to file a second §2255 motion.

based on subsequent state court vacatur of a conviction used to
enhance a federal sentence); United States v. Pettiford, 101 F.3d
199 (1st Cir. 1996) (same).

A prisoner is deemed entitled to such relief because his
sentence was enhanced without a valid "factual basis," yet he
remains incarcerated pursuant to that sentence. Dretke v. Haley,
541 U.S. 386, 397 (2004) (Stevens, J., dissenting on other
grounds). Therefore:

> it follows inexorably that [he] has been denied due
> process of law. Thompson v. Louisville, 362 U.S. 199
> (1960); Jackson v. Virginia, 443 U.S. 309 (1979). And
> because that constitutional error clearly and
> concededly resulted in the imposition of an
> unauthorized sentence, it also follows that the
> [petitioner] is a 'victim of a miscarriage of justice,'
> Wainright v. Sykes, 433 U.S. 72, 91 (1977), entitled to
> immediate and unconditional release.

Id. at 398.   Although Justice Stevens was commenting on the
injustice of continued incarceration of a state prisoner whose
sentence was erroneously enhanced under a state habitual offender
statute, the First Circuit has twice indicated that a sentencing
enhancement under the Federal Sentencing Guidelines that is
predicated on a subsequently vacated state court conviction also
constitutes the type of "miscarriage of justice" properly raised
on collateral attack.   See Mateo, 398 F.3d at 136; Pettiford, 101
F.3d at 201.

24

The government agrees that the granting of Goldman's motion for a new trial in state court constituted a "vacatur" of his predicate state conviction.  _See, e.g._, Gov't Opp. to §2241 Petition at 4 (noting that "the petitioner's state offense was vacated").

The First Circuit has held that when a petitioner obtains a state court order invalidating a predicate state court conviction, his federal sentence is subject to collateral attack under §2255 as long as the state conviction was reversed "for errors of law or because constitutionally invalid," rather than "'for reasons unrelated to innocence or errors of law . . . [such as] to restore civil rights or remove the stigma associated with a criminal conviction.'"  _Mateo_, 398 F.3d at 134-35 (quoting U.S.S.G. §4A1.2, cmt. n.10).

Although the state court noted that in considering Goldman's motion for a new trial, it "had no appellate function and [did] not, therefore, address whether or not the trial judge's denial of defendant's motions for transcript and for appellate counsel was error," the court did find that the denial of Goldman's right to a direct appeal constituted a "miscarriage of justice" sufficient to require a new trial under Massachusetts Rule of Criminal Procedure 30(b).  _See_ Ex. 9 (_Commonwealth v. Goldman_,

Nos. 54316, 54318 (Mass. Sup. Ct. October 15, 2001)) at 5, n.2.
In addition, the court based its decision to grant a new trial on
the fact that in 1977 Justice Brogna "obstructed appellate review
of his own doings at the two week bench trial by concluding that
defendant was not to have a transcript because his proposed
appellate claims were 'frivolous.'" Id.  "There is, at least, the
appearance of a self-serving animus in such rulings," the court
noted.  Id.

These state court findings made it clear that the granting
of a new trial was based on perceived errors of law and
constitutional errors that improperly deprived Goldman of his
right to appeal.  See Mateo, 398 F.3d at 136-37 (evaluating the
basis of a state court vacatur order and noting that "for
purposes of Guidelines analysis, a federal court may and
sometimes must, in appropriate circumstances, identify the reason
for the state action in order to determine whether a prior
sentence should be counted").  Justice Toomey's decision to grant
Goldman a new trial was based on serious constitutional and
statutory errors concerning the 1977 conviction.  See Douglas v.
California, 372 U.S. 353 (1963) (finding equal protection
violation in state court's denial of appointed counsel for first
appeal based on court's evaluation of likely success of appeal);

Mass. Gen. Laws, ch. 278, §28, Mass. Gen. Laws, ch. 211A, §10; Commonwealth v. Frank, 680 N.E.2d 67, 69 n.1 (1997) (noting the statutory right to direct appeal of a criminal conviction in Massachusetts).

As Justice Toomey concluded, a "miscarriage of justice" resulted from the failure of Justice Brogna to permit Goldman's requested direct appeal and not from some reason "unrelated to innocence or errors of law . . . [such as] to restore civil rights or remove the stigma associated with a criminal conviction.'" Mateo, 398 F.3d at 134-35; Therefore, Justice Toomey's order is the type of vacatur that would justify Goldman's request for resentencing on his 1993 federal conviction under Mateo and Johnson if §2255 were available to him and his claim were not defaulted.

However, the government asserts that §2255 is not now available to Goldman and his claim is defaulted. As discussed below, the government is correct in these contentions.

Nevertheless, this is not the end of the inquiry. In certain circumstances §2241 provides a basis for granting relief to a federal prisoner for whom §2255 is not available. In this case, Goldman has demonstrated that he is, within the meaning of the applicable law, "actually innocent" of the charge that he

27

participated in a kidnapping of Lopes.  Therefore, he is entitled
to review of his claim pursuant to §2241.  In addition, Goldman's
meritorious claim of such "actual innocence" excuses his
procedural default.  Therefore, Goldman is entitled to review and
relief under §2241.

    B. <u>Obstacles to Relief</u>

       1. <u>Access to the court</u>

    Goldman's access to this court is limited because a prisoner
seeking to challenge collaterally his federal sentence must rely
primarily upon 28 U.S.C. §2255 for relief.  <u>See</u> <u>United States v.
Barrett</u>, 178 F.3d 34, 50 (1st Cir. 1999).  Here, Goldman is
unable to proceed under §2255 because he previously brought a
§2255 challenge on other grounds, and because the First Circuit
found that a second §2255 challenge addressing his Career
Offender status was barred by AEDPA's statutory limitations on
second §2255 motions.  <u>See</u> <u>supra</u> §II(E); <u>Goldman II</u>, at 1.

    Goldman, therefore, attempts to raise his claims here in a
petition for habeas corpus under §2241.  However, §2255 sets
strict limits on the availability of §2241 to federal prisoners:

> 'An application for a writ of habeas corpus [under
> §2241] in behalf of a prisoner who is authorized to
> apply for relief by motion pursuant to [§ 2255], shall
> not be entertained if it appears that the applicant has
> failed to apply for relief, by motion, to the court
> which sentenced him, or that such court has denied him

> relief, unless it also appears that the remedy by motion is inadequate or ineffective to test the legality of his detention.'

Barrett, 178 F.3d at 49 (second alteration in original) (quoting 28 U.S.C. §2255(e)). Under this "savings clause," a petitioner, like Goldman, who has already applied for and been denied relief under §2255 may only challenge the validity of his detention under §2241 if §2255 is "inadequate or ineffective." 28 U.S.C. §2255; Barrett, 178 F.3d at 49-50.

A petitioner's inability to meet the procedural requirements of §2255 alone is not sufficient to render §2255 "inadequate or ineffective" and permit resort to §2241. Barrett, 178 F.3d at 50. The First Circuit has not fully defined all of the circumstances that might allow a federal prisoner to utilize §2241 to challenge his detention. See id. at 52 ("it is not necessary in this case to articulate those circumstances precisely-we leave that task for another day"); Sustache-Rivera v. United States, 221 F.3d 8, 17 (1st Cir. 2000) ("[N]or do we need to resolve the meaning of the savings clause . . . .").[7]

---

[7] In Barrett, the First Circuit discussed standards concerning the savings clause suggested by other circuits in In re Davenport, 147 F.3d 605 (7th Cir. 1998), In re Dorsainvil, 119 F.3d 245 (3rd Cir. 1997), and Triestman v. United States, 124 F.3d 361 (2nd Cir. 1997) but noted that at least portions of these standards may be in doubt after the Supreme Court's decision in Bousley v. United States, 523 U.S. 614 (1998).

However, in Barrett the First Circuit stated that "habeas corpus relief under §2241 remains available for federal prisoners in limited circumstances," 178 F.3d at 51, and that "[a] claim of actual innocence-defined as factual innocence, not mere legal insufficiency-will have a mechanism for review." Id. at 57.   In Barrett and a subsequent case, the First Circuit has further confirmed that §2241 would be available to petitioners raising claims of actual innocence by precluding access to §2241 only after finding that a petitioner did not "raise a question of actual innocence." Id. at 52; Sustache-Rivera, 221 F.3d at 19 (same).

As discussed below, this court finds that Goldman has presented a meritorious claim of actual innocence.   Therefore, he is entitled to review pursuant to §2241 unless his claims are defaulted and that default is not excused.   Although review under §2241 may be available in other circumstances absent a showing of actual innocence, it is not necessary to decide what those circumstances might be in this case.   Cf. Sustache, 221 F.3d at 17.

As discussed below, Goldman's claim is procedurally defaulted.   However, his compelling showing of actual innocence excuses that default and makes review under §2241 available.

30

Goldman is also entitled to relief under §2241. As discussed earlier, Goldman's request for resentencing based on the vacatur of his predicate state court conviction would be meritorious under Pettiford and Mateo if it could be brought under §2255. When §2241 is available, it operates to provide relief in the same circumstances as §2255 if it were available. See Hill v. United States, 368 U.S. 424, 427 (1962) (noting that §2255 is "intended simply to provide . . . a remedy exactly commensurate with that which had previously been available by habeas corpus [under §2241]"); 3 Charles Alan Wright, Nancy J. King, Susan R. Klein, Sarah N. Welling, Federal Practice & Procedure (Criminal) §591 (3d. ed. 2008) ("[P]recedents under §2255 and under the habeas statutes often may be used interchangeably."). Therefore, because Goldman's claim would be meritorious if it could be reviewed under §2255, it is meritorious under §2241 since review is available under that statute.

In this case, §2241 serves "the essential function of habeas corpus . . . [of] 'giv[ing] a prisoner a reasonable opportunity to obtain a reliable judicial determination of the fundamental legality of his conviction and sentence.'" Barrett, 178 F.3d at 51 (quoting In re Davenport, 147 F.3d 605, 609 (7th Cir. 1998)

(third alteration in original).  Because Pettiford and Mateo held
that a sentence based on a state conviction that is subsequently
vacated is legally erroneous and should be corrected through
collateral attack, see Mateo, 398 F.3d at 134; Pettiford, 101
F.3d at 201, relief under §2241 is in this case permissible and
justified.

        2. Procedural Default

    Goldman's petition faces a final obstacle -- procedural
default.   In the context of §2255 and §2254 petitions, the
doctrine of "procedural default" bars a court from considering
any claim in a postconviction action that was not presented in
prior proceedings.  See, e.g., Oakes v. United States, 400 F.3d
92, 95 (1st Cir. 2005) ("If a federal habeas petitioner
challenges his conviction or sentence on a ground that he did not
advance on direct appeal, his claim is deemed procedurally
defaulted."); Bousley v. United States, 523 U.S. 614 (1998)
(petitioner generally may not raise a previously available claim
for the first time on §2255 review); McCleskey v. Zant, 499 U.S.
467, 492-97 (1991) (same regarding claims not raised in prior
petition).   The First Circuit has held that this procedural
default doctrine applies equally to §2241 petitions.   See
Sustache-Rivera, 221 F.3d at 17 (stating that the default

                        32

doctrine discussed in <u>Bousley</u> applies to §2241 petitions).

The government argues that Goldman's claims under §2241 are procedurally defaulted because he failed to raise them earlier, either on appeal, in a prior §2255 challenge, or simply at an earlier time.

However, "[a] procedural default is not necessarily a total bar to federal habeas relief." <u>Oakes</u>, 400 F.3d at 95. Procedural default does not strip a habeas court of jurisdiction to consider defaulted claims. Rather "it provides only a strong prudential reason, grounded in 'considerations of comity and concerns for the orderly administration of criminal justice,' not to pass upon a defaulted constitutional claim presented for federal habeas review." <u>Dretke</u>, 541 U.S. at 393 (quoting <u>Francis v. Henderson</u>, 425 U.S. 536, 538-39 (1976)).

Therefore, "[n]otwithstanding such a default, a federal habeas petition will be allowed to go forward if the petitioner can show either (i) that there is cause for the default and actual prejudice resulting from it, or (ii) that he is actually innocent . . . ." <u>Oakes</u>, 400 F.3d at 95; <u>Dretke</u>, 541 U.S. at 393 (noting the general recognition of "an equitable exception to the [procedural default] bar when a habeas applicant can demonstrate cause and prejudice for the procedural default" or actual

innocence).  Under this rule, a showing of "cause and prejudice" or "actual innocence" excuses procedural default and permits a court to decide the merits of otherwise defaulted claims.  See Dretke, 541 U.S. at 395 (describing the excuse of procedural default as a "gateway" to consideration of defaulted claims).

Goldman has presented a claim of actual innocence.  However, the Supreme Court has instructed that "a federal court faced with allegations of actual innocence, whether of the sentence or of the crime charged, must first address all non-defaulted claims for comparable relief and other grounds for cause to excuse the procedural default."  Dretke, 541 U.S. at 394-95 (expressing concern that permitting consideration of actual innocence in that case without first considering other ways of reaching the merits of the petitioner's claims would "license district courts to riddle the cause and prejudice standard with ad hoc exceptions").

In light of the Supreme Court's instruction in Dretke, this court must first evaluate whether Goldman has shown cause and prejudice sufficient to excuse any procedural default of his claims, before addressing his claim of actual innocence.  This is a close question.  However, the court concludes that Goldman has not shown sufficient cause to excuse his procedural default. Therefore, the court is deciding his actual innocence claim.

a. Cause and Prejudice

The First Circuit has explained that to establish cause, a petitioner must show "that some external impediment, such as government interference or the reasonable unavailability of the factual or legal basis for a claim, prevented it from being raised earlier." Andiarena v. United States, 967 F.2d 715, 718 (1st Cir. 1992) (citing McCleskey, 499 U.S. at 497). To establish prejudice on collateral review, a petitioner must establish that the error complained of had "substantial and injurious effect or influence." Sustache, 221 F.2d at 218; see also Ellis v. United States, 313 F.3d 636, 643-44 (1st Cir. 2002) (same). Alternatively, "if a habeas petitioner can meet the prejudice standard needed to establish ineffective assistance under Strickland [v. Washington, 466 U.S. 668 (1984)], then the prejudice standard under the 'cause and prejudice' showing to excuse a procedural default is also met." Lynch v. Ficco, 438 F.3d 45, 49 (1st Cir. 2006).

In this case, it is clear that the error complained of -- Goldman's sentencing as a Career Offender despite the invalidity of one of his essential prior convictions -- had "substantial and injurious effect." The government does not dispute that Goldman's Career Offender status increased his sentence by at

least seventeen years. This constitutes a "substantial and injurious effect or influence" and meets the Strickland standard. See Glover v. United States, 531 U.S. 198, 203 (2001) (holding that there is no baseline or quantifiable increase in a defendant's sentence that must be shown to establish prejudice under Strickland).

With regard to cause, Goldman argues that the legal landscape at the time of his federal sentencing, direct appeal, and 1995 §2255 motion either provide adequate cause to explain his failure to challenge his Career Offender status earlier or indicate that no procedural default exists since he had no prior opportunity to raise these claims. See Pet. Trial Br. at 14-19.

Goldman is correct that, with only one possible exception for the complete denial of appointed counsel, see Johnson, 544 U.S. at 303-04, a prisoner's options are extremely limited with regard to when he can challenge the validity of predicate state convictions used to enhance a federal sentence. As explained earlier, in Custis the Supreme Court held that a federal defendant had no right to challenge the validity of predicate convictions during a federal sentencing hearing. 511 U.S. at 488, 497. The Court emphasized that a defendant attempting to mount such an attack must instead "apply for reopening of any

36

federal sentence enhanced by the state sentences" _after_ he is "successful in attacking these state sentences" in state court or in a habeas petition challenging the predicate state conviction. Id. at 497.

Earlier in 1994, shortly before the Supreme Court's decision in Custis, the First Circuit had ruled in Isaacs that the Sentencing Guidelines precluded collateral review at federal sentencing of prior convictions used to enhance a federal sentence, and that the Constitution mandated such collateral review only if defendant claimed a "structural error" in his predicate conviction. 14 F.3d at 108-110, 112.

In Daniels v. United States, 532 U.S. 374 (2001), the Supreme Court clarified that a defendant could not challenge a predicate state conviction used to enhance a federal sentence in any federal sentencing proceeding or in a §2255 motion without first successfully challenging the predicate state conviction in state court or in a federal habeas petition regarding the state conviction. Id. at 382. The Court again held that if any state court or habeas challenge to the predicate conviction was successful, "the defendant may then apply for reopening of his federal sentence." Id.

Based on these precedents, Goldman argues that it was not

permissible for him to challenge his 1977 kidnapping conviction in federal court until after he successfully challenged that conviction in state court and, therefore, his failure to raise claims about his 1977 conviction in prior proceedings either does not constitute a procedural default or is excused by adequate cause. See, e.g., Goldman Sept. 15, 2006 Supp. Mem. at 6-9.

The First Circuit's 1994 decision in Isaacs, which required that a defendant challenge state convictions in state court rather than federal court, predated Goldman's direct appeal.[8] Goldman's appointed appellate counsel, Curhan, testified in these proceedings that at the time he filed Goldman's direct appeal, Goldman asked him to raise a challenge to the 1977 conviction. However, Curhan understood that precedent prohibited raising such a claim prior to state court vacatur of the relevant conviction and presentation of that vacatur to the district court. Curhan told Goldman that his appointment as appellate counsel did not authorize him to go to state court to try to vacate the 1977 conviction. See Mar. 18, 2008 Tr. at 99, 101. Curhan also told Goldman that he was unable to raise the issue on direct appeal

---

[8] The Isaacs decision was issued on January 25, 1994. Goldman's statement of issues for the direct appeal of his 1993 conviction and sentence was filed February 18, 1994 and his brief was filed on March 8, 1994. See Ex. 10 (First Circuit Docket of Goldman's direct appeal) at 4.

because it had not been presented to the district court.  Id. at 100-01.

When a claim is properly not raised on direct appeal, a defendant's failure to present that claim does not constitute a procedural default.  See Massaro v. United States, 538 U.S. 500, 503-09 (2003).  In Massaro, the Supreme Court ruled that failure to raise an ineffective-assistance-of-counsel claim on direct appeal does not constitute procedural default or bar consideration of such a claim in a §2255 proceeding because such ineffectiveness claims are not cognizable on direct appeal and are appropriately brought only later in a §2255 proceeding. Id. at 503.  Similarly, here, the Isaacs decision made clear that Goldman's challenge to his 1977 conviction could properly be raised only after he had successfully challenged his conviction in state court.  Therefore, Curhan's reliance on that decision at the time of Goldman's direct appeal was reasonable.

Similarly, prior to Goldman's filing of his first §2255 motion in 1995, the Supreme Court's 1994 decision in Custis made clear that the appropriate place and time to challenge the use of his 1977 conviction as a federal sentencing enhancement was in a motion to reopen Goldman's federal sentence after he successfully challenged his 1977 conviction in state court.  Custis, 511 U.S.

at 497.  At the time he filed his first §2255 motion in 1995, he had not yet successfully challenged his 1977 conviction in state court and, therefore, a "fact" necessary to his §2255 motion was "reasonably unavailable."  <u>See</u> <u>Johnson</u>, 544 U.S. at 304-07 (holding that vacatur of predicate conviction was "fact" necessary for filing §2255 motion based on such vacatur). Goldman had no incentive to include his unripe claim concerning that conviction in his 1995 §2255 motion because, prior to the passage of AEDPA in 1996, he expected that the proper course would be to file a second §2255 motion after obtaining vacatur of his state court conviction.[9]

The First Circuit's decision in <u>Isaacs</u> and the Supreme Court's decision in <u>Custis</u>, therefore, provide sufficient "cause" to excuse Goldman's failure to attack his 1977 conviction in his direct appeal or his 1995 first §2255 motion.  These two 1994 decisions predated Goldman's appeal and §2255 motion, and directed that it was not appropriate for a federal defendant to challenge predicate state convictions that enhanced a federal sentence before successfully attacking those convictions in state

---

[9] Goldman could have included his unripe claim in his 1995 §2255 motion and sought a stay while he pursued vacatur.  This was attempted in <u>McCarthy v. United States</u>, 1998 WL 1085766 (1st Cir. Dec. 18, 1998).  However, his request for a stay would likely have been properly denied, as it was in <u>McCarthy</u>.  <u>Id.</u>

court.  See Custis, 511 U.S. at 497; Isaacs, 14 F.3d at 108-110.
The decisions, therefore, created the "reasonable unavailability
of the factual or legal basis for [Goldman's] claim" at the time
of his direct appeal and first §2255 motion and the absence of
that factual basis excuses any procedural default caused by
Goldman's failure to address his 1977 conviction in those
proceedings.  Andiarena, 967 F.2d at 718.

However, Goldman must still show cause for failing to raise
his claim regarding the 1977 conviction at his 1993 sentencing.
See Prou v. United States, 199 F.3d 37, 47 (1st Cir. 1999)
(affirming that "a defendant's failure to object [to an issue] at
sentencing . . . constitutes a procedural default, leaving the
issue open to collateral attack only if the defendant can show
cause and prejudice"); United States v. LaValle, 175 F.3d 1106,
1109 (9th Cir. 1999) (rejecting government's cause and prejudice
challenge to petitioner's §2255 motion based on state vacatur of
a predicate conviction because the petitioner had challenged the
predicate conviction at his 1994 sentencing hearing); United
States v. Maybeck, 23 F.3d 888, 892 (4th Cir. 1994) (holding that
the cause and prejudice standard applied to defendant's failure
to object to his Career Offender classification at sentencing).
Goldman has not made this showing.

41

Goldman does not claim that he raised any objection to the validity of his 1977 conviction during his 1993 federal sentencing proceeding. In any event, Goldman's 1993 Sentencing Memorandum demonstrates that he was aware at that time of the impact of the 1977 kidnapping conviction on his sentence, but did not challenge the validity of that conviction.

Goldman's 1993 Sentencing Memorandum discussed his 1977 kidnapping conviction solely to argue that it was part of the same "scheme or plan" as his other predicate conviction and, therefore, should not be counted separately for Career Offender purposes. See United States v. Goldman, No. 92-10229-ADM, Def. Frank Goldman's Objections to the PSR and Sentencing Mem. at 18-21. Goldman's state convictions were discussed in depth at his sentencing hearing on April 24, 1993. See United States v. Goldman, No. 92-10229-ADM, Apr. 24, 1993 Sentencing Tr. at 8-15. Goldman's counsel again did not suggest that the 1977 kidnapping conviction was invalid, only that it should be considered part of the same "scheme or plan" as the other predicate offense or, in the alternative, that the sentencing judge should downwardly depart because Goldman's criminal history significantly overstated the likelihood that he would commit other crimes. Id. The transcript of the sentencing hearing and Goldman's Sentencing

Memorandum confirm that Goldman failed to raise at his original sentencing that his 1977 kidnapping conviction was an invalid basis for a Career Offender enhancement.

Although the First Circuit's January 25, 1994 decision in Isaacs prohibited defendants from raising such claims during federal sentencing proceedings, the Isaacs decision was issued after Goldman's sentencing in 1993. The existence of the Isaacs decision and the First Circuit's analysis in it demonstrate that before Isaacs defendants in the First Circuit and elsewhere were presenting challenges to predicate convictions during federal sentencing proceedings. See Isaacs, 14 F.3d at 107 (describing how appeal arose after defendant successfully challenged the validity of a predicate conviction during his sentencing hearing); id. at 109 (discussing how, at the time of the Isaacs decision, appellate courts were divided as to whether the Sentencing Guidelines permitted challenges to predicate convictions during federal sentencing proceedings).

When a claim has not yet been precluded by relevant case law and, indeed, is being raised by other defendants, a petitioner cannot show that such a claim was reasonably unavailable to him as is necessary to establish cause to excuse procedural default. See Bousley, 523 U.S. at 622 (rejecting contention that a §2255

43

claim was unavailable and provided cause when "at the time of [the] plea, the Federal Reporters were replete with cases involving" the same claim raised in the §2255 motion); Engle v. Isaac, 456 U.S. 107, 134 (1982) ("Where the basis of a . . . claim is available, and other defense counsel have perceived and litigated that claim, the demands of comity and finality counsel against labeling alleged unawareness of the objection as cause for a procedural default.").

Goldman's counsel could have challenged the validity of the 1977 conviction at the 1993 sentencing, but did not. Goldman has not shown cause to excuse this default and, therefore, his claim based on his subsequent challenge to the 1977 conviction is defaulted. See, e.g., Prou, 199 F.3d at 47 (excusing failure to object at sentencing only because petitioner showed ineffective assistance of counsel at sentencing sufficient to establish cause); United States v. Frady, 456 U.S. 152, 167-68 (1982) (barring collateral consideration of a claim defaulted by defendant's failure to object contemporaneously at trial because such failure constituted a "double procedural default" not excused by a showing of cause and prejudice).

The government argues that even if Goldman's failure to challenge the 1977 conviction at his 1993 sentencing hearing did

not create a procedural default, Goldman's claim would still be defaulted by his failure to "diligently pursue vacatur of his state court conviction once he was aware that the conviction had the effect of increasing his federal sentence," as is required of prisoners filing §2255 motions by <u>Johnson v. United States</u>, 544 U.S. 295 (2005). <u>See</u> Gov't Trial Brief at 7; Gov. Cause and Prej. Mem. at 2. In <u>Johnson</u>, the Supreme Court held that a claim challenging Career Offender status is timely under §2255's one-year statute of limitations only if it is filed within one year of vacatur of a state conviction <u>and</u> the petitioner sought diligently that vacatur either after judgment entered on his federal conviction or after the April 24, 1996 passage of AEDPA which, among other things, imposed a one-year statute of limitations on §2255 motions. <u>See</u> <u>Johnson</u>, 544 U.S. at 311.

In support of the diligence requirement, the Court found that the time limits in §2255 were designed by Congress to promote finality and limit federal prisoners' ability to attack their federal sentences. <u>Id.</u> at 309-10. It noted that under §2255, as amended by AEDPA, the one-year limitations period could restart from the date a new fact "could have been discovered through the exercise of due diligence." <u>Id.</u> at 300 (quoting 8 U.S.C. §2255(6)(4)). The Court, therefore, found it incompatible

45

with §2255 to permit a petitioner to file a §2255 motion within one year of a state vacatur "no matter how long he may have slumbered before starting the successful [vacatur] proceeding." Id. at 307.

The Court found in Johnson that the petitioner had failed to show the necessary diligence when:

> [the petitioner] failed to attack the predicate for enhancement by filing his state habeas petition until February 1998, more than three years after entry of judgment in the federal case. Indeed, even if we moved the burden of diligence ahead to the date of finality of the federal conviction or to AEDPA's effective date two days later, Johnson would still have delayed unreasonably, having waited over 21 months.

Id. at 311. The petitioner in Johnson "offered no explanation for this delay, beyond observing that he was acting pro se and lacked the sophistication to understand the procedures." Id. Finding that "pro se representation alone or procedural ignorance" cannot "excuse . . . prolonged inattention when a statute's clear policy calls for promptness," the Court found Johnson's efforts at vacatur "fell far short of reasonable diligence" necessary to permit access to §2255. Id.

Goldman did bring a motion to reopen his 1993 federal sentencing within one year of the state court vacatur of his state court conviction. See Goldman v. United States, C.A. No. 95-10989, Feb. 12, 2002 Docket Entry. However, he did not seek

46

vacatur until four years after the passage of AEDPA and nearly seven years after the entry of judgment in his federal case.[10] The government argues that this delay establishes an additional ground for finding Goldman's challenge to his Career Offender enhancement procedurally defaulted.

Some facts support the contention that Goldman's claim is barred because he did not act with the diligence required by Johnson. The period of time Goldman waited before filing his state court motion for a new trial exceeds the amount of time found to be unreasonable in Johnson. In addition, the explanation Goldman offers for this delay is similar to that found insufficient in Johnson, including that he did not have an attorney. Johnson, 544 U.S. at 311.

Goldman suggests that any delay on his part in seeking vacatur of his 1977 convictions was due to his difficulties in finding an attorney and the inaction of those he expected would represent him. As described earlier, Goldman attempted to hire a private attorney, Leppo, in about 1996, to try to vacate his Bristol County convictions. Mar. 19, 2008 Tr. at 88 (Test. of

_____

[10] Judgment in Goldman's federal case entered on April 27, 1993. AEDPA went into effect on April 24, 1996. Goldman did not move in state court for a new trial concerning his 1977 kidnapping conviction until April 14, 2000. See Ex. 9 (Commonwealth v. Goldman, Nos. 54316, 54318 (Mass. Sup. Ct. October 15, 2001)) at 2.

Goldman).   However, Leppo never took any action to vacate those convictions, evidently because Goldman was not able to pay him. <u>See</u>  Ex. 22 (Aug. 27, 2002 Aff. of Martin Leppo) (affirming that after an eighteen month period of communication, Goldman could not work out the financial arrangements with Leppo).

However, Goldman's filing of a <u>pro</u> <u>se</u> §2255 motion in 1995, <u>see</u> Ex. 7 (<u>Goldman v. United States</u>, 95-10989-ADM Docket) at 1, demonstrates that he was not completely unable to represent himself if necessary.   Therefore, he was arguably better positioned than the petitioner in <u>Johnson</u> to make a <u>pro</u> <u>se</u> motion in state court to vacate his convictions, even if he was not able to hire a lawyer.

In addition, unlike the petitioner in <u>Johnson</u>, Goldman was represented by counsel in postconviction proceedings as early as July, 1995.   <u>See</u> Ex. 7 (<u>Goldman v. United States</u>, 95-10989-ADM Docket) at 1 (showing notice of appearance by Kimberly Homan for Goldman in his first §2255 motion on July 10, 1995).   O'Dea,  who eventually filed Goldman's motion in state court for a new trial, was representing him as early as June, 1998, but did not file the state court motion until April, 2000.   <u>See</u> <u>id.</u> (showing notice of appearance by O'Dea in Goldman's federal action on June 26, 1998).   Goldman has not offered any explanation for why these

48

attorneys did not file a motion to vacate his 1977 conviction in state court earlier than 2000.

Goldman's failure to file a <u>pro se</u> motion in state court and his attorneys' failure to file such a motion earlier than 2000 weigh in favor of finding that his claim is now barred because he did not proceed with the diligence required by <u>Johnson</u>. Nevertheless, his petition is not barred by <u>Johnson</u>.

The Court's holding in <u>Johnson</u> was based on an interpretation and application of the specific language of AEDPA, which amended §2255 to establish the one-year statute of limitations and "due diligence" requirement.  <u>See</u> <u>Johnson</u>, 544 U.S. at 308 (describing application of the diligence requirement as an attempt to "implement the <u>statutory mandate</u> that a petitioner act with due diligence in discovering the crucial fact of the vacatur order" (emphasis added)).  Goldman has submitted a petition under §2241, which was not amended by AEDPA to provide comparable, express limitations.  However, the First Circuit has held that federal petitioners cannot use §2241 to evade the stringent procedural requirements of §2255.  <u>See</u> <u>Barrett</u>, 178 F.3d at 50.  Therefore, this court finds the mere fact that Goldman is proceeding under §2241 does not permit him to evade the diligence requirement established by <u>Johnson</u>.

However, Goldman was more diligent in pursuing the vacatur of his state conviction than the petitioner in <u>Johnson</u>. In <u>Johnson</u>, the Court did not rule that a particular period of delay necessarily precludes a finding of diligence, and instead suggested a reasonableness standard to evaluate whether a petitioner was sufficiently diligent. See <u>Johnson</u>, 544 U.S. at 311 (finding that the petitioner "delayed unreasonably" under the circumstances); <u>id.</u> at 319 (Kennedy, J. dissenting) (noting that the majority opinion "leaves unsaid what standard will be used for measuring whether a petitioner acted promptly"). The Court explained that "diligence can be shown by prompt action on the part of the petitioner as soon as he is in a position to realize that he has an interest in challenging the prior conviction." <u>Johnson</u>, 544 U.S. at 308.

Goldman did take some prompt action with regard to his 1977 conviction when he asked his appointed appellate attorney, Curhan, in August, 1993, to challenge his 1977 conviction either in his federal appeal or in state court. See Mar. 18, 2008 Tr. at 98, 102 (Test. of Curhan); Mar. 19, 2008 Tr. at 84 (Test. of Goldman). This request did not result in the filing of a motion to vacate in state court. However, Goldman did make an immediate effort to get Curhan to challenge his 1977 conviction in state

court when, in 1993, that conviction for the first time had real consequences for him.

His efforts continued over the next several years as he attempted to hire Leppo and Creedon, and his family eventually succeeded in hiring O'Dea to file in state court his motion for a new trial. Once again, Goldman explains that an eighteen-month delay in filing the state court motion occurred because Leppo accepted his files and appeared to be working on his case. Mar. 19, 2008 Tr. at 88 (Test. of Goldman); Ex. 22 (Aug. 27, 2002 Aff. of Martin Leppo). Therefore, Goldman is not situated similarly to the petitioner in Johnson who "offered no explanation" for his delay in pursuing state-court vacatur. Johnson, 544 U.S. at 311 (emphasis added). Rather, Goldman's prompt and continuing efforts, and his explanation for some of the passage of time, makes his delay in obtaining vacatur of his state conviction more "reasonable" than the delay considered in Johnson.

In addition, the timing of Goldman's predicate conviction and federal sentence indicate that his delay in obtaining vacatur was not unreasonable. In Johnson, the petitioner had his federal sentence enhanced in 1994 based on two 1989 state court convictions. Johnson, 544 U.S. at 298. Thus, there was only a five-year delay between the state court convictions and the

51

federal enhancement.  Had the petitioner in <u>Johnson</u> moved to challenge his 1989 state court convictions immediately after his 1994 federal conviction, the records of his 1989 convictions would have been only five years old, perhaps eliminating the Court's concern that the "predicate conviction gr[ew] increasingly stale" as the petitioner waited to file his state court vacatur motion.  <u>Id.</u> at 307.

In contrast, Goldman's 1993 federal sentence was enhanced based on a 1977 state court conviction that was already sixteen years old at the time of his federal sentencing.  Four justices in <u>Johnson</u> who dissented from the majority's imposition of a bar for lack of diligence noted that such a bar could not achieve its purpose of limiting delay between a state court conviction and a motion to vacate when a predicate state conviction was already very old at the time of federal sentencing.  <u>See</u> <u>Johnson</u>, 544 U.S. at 317 (Kennedy, J. dissenting).  As sixteen years had already passed between Goldman's state court conviction and his federal sentence, additional diligence after his federal conviction would not have materially improved the availability of evidence regarding the 1977 case.

More specifically, the passage of time between Goldman's federal sentence in 1993 and the vacatur of his 1977 conviction

in 2001 did not materially injure the government's ability to retry him. Lopes, the alleged victim and primary witness against Goldman in 1977, was still alive in 2001. <u>See</u> Ex. 34 (Death Notice that Lopes died in 2002). Goldman's 1977 co-defendant, Larkin died in November, 2001, <u>see</u> Ex. 28 (Larkin Death Certificate). However, as discussed below, it now clearly appears that Larkin's candid testimony would have exculpated Goldman.

The evidence that was available in 1977 but unavailable in 2001 was largely lost before 1993. In granting Goldman's new trial motion in 2001, Justice Toomey noted that a transcript of the original trial was unavailable due to actions by Justice Brogna in 1977, that the court reporters' notes had been destroyed six years after that, and that no reconstructed record was possible since trial defense counsel and the district attorney's office reported that their files had also been destroyed. Ex. 9 (<u>Commonwealth v. Goldman</u>, Nos. 54316, 54318 (Mass. Sup. Ct. October 15, 2001)) at 4. Goldman's trial counsel, Zalkind, affirmed that his records had "probably been disposed of" as of 1993. Ex. 5 (Aff. of Zalkind). Under these circumstances, any prejudice to the government's ability to oppose Goldman's motion to vacate his 1977 conviction and to

53

retry him when that motion was granted occurred as a result of events between 1977 and 1993 and not during the period of time it took for Goldman to vacate his 1977 conviction after it first had consequences in 1993.

In essence, beginning promptly after his federal sentence in 1993 Goldman, who had been asserting his innocence since 1977, persistently tried to get a lawyer to challenge his conviction in state court.  The government was not prejudiced by the passage of time from 1993 to 2001 when Goldman's state conviction was vacated.  In these circumstances, the court finds that Goldman's conduct was reasonable and that he should not be deprived of his opportunity to obtain review and relief under §2241 because he unreasonably delayed in vindicating his rights.  Rather, the court finds that Goldman was sufficiently diligent within the meaning of <u>Johnson</u>.

Moreover, even if Goldman was not sufficiently diligent, his showing of actual innocence is sufficient to excuse that lack of diligence.  <u>Cf.</u> <u>United States v. Powell</u>, 266 Fed. App'x. 263 (4th Cir. Feb. 21, 2008) (unpublished) (vacating lower court decision that had found actual innocence could not excuse failure to diligently pursue state court vacatur, but making no ruling on this issue).  Permitting actual innocence to excuse a lack of

diligence serves the essential purpose of the actual innocence exception to prevent procedural bars from permitting a fundamental miscarriage of justice to be perpetuated. <u>See</u> <u>Barrett</u>, 178 F.3d. at 53 (reserving ruling on whether showing of actual innocence could waive statutory restrictions).

As described earlier, the court also finds that Goldman's failure to challenge his 1977 conviction on direct appeal or in his prior §2255 motions did not constitute a procedural default because the issue was not presented to the district court and because the 1977 conviction had not been vacated by the state court. As also described earlier, the court does find, however, that Goldman's failure to object at his 1993 sentencing to his Career Offender status based the invalidity of his predicate 1977 kidnapping conviction constituted a procedural default of his current claim challenging his Career Offender enhancement, and that Goldman has not shown "cause" sufficient to excuse this default.

b.  <u>Actual Innocence</u>

Nevertheless, Goldman's claim may still be reviewed despite this default. It is universally accepted that a showing of "actual innocence" in a collateral challenge is an alternative to a showing of cause to excuse a procedural default. As the

55

Supreme Court has explained:

> Federal courts retain the authority to issue the writ of habeas corpus in a further, narrow class of cases <u>despite a petitioner's failure to show cause for a procedural default</u>. <u>These are extraordinary instances when a constitutional violation probably has caused the conviction of one innocent of the crime</u>. We have described this class of cases as implicating a <u>fundamental miscarriage of justice</u>.

<u>McCleskey</u>, 499 U.S. at 494 (emphasis added) (citing <u>Murray v. Carrier</u>, 477 U.S. 478, 485 (1986)).

In cases in which a petitioner asserts he is innocent of the crime of which he was convicted, the Supreme Court has repeatedly affirmed the importance of the "actual innocence exception" to keep a channel open for review of otherwise defaulted claims to avoid the "miscarriage of justice" that would result from applying the prudential default doctrine despite compelling claims of innocence. <u>Id.</u> at 494-95. ("If petitioner cannot show cause, the failure to raise the claim in an earlier petition may nonetheless be excused if he or she can show that a fundamental miscarriage of justice would result from a failure to entertain the claim."); <u>Schlup v. Delo</u>, 513 U.S. 298, 314-15 (1995) (Because [the petitioner] has been unable to establish 'cause and prejudice' . . . , [he] may obtain review of his constitutional claims only if he falls within the 'narrow class of cases ... implicating a fundamental miscarriage of justice,'" based on his

"claim of innocence"); <u>Bousley</u>, 523 U.S. at 623 (finding that petitioner failed to establish "cause" to excuse the default of his claim, but ordering a remand "to permit petitioner to attempt to make a showing of actual innocence").

In such cases, actual innocence serves not as an independent basis for postconviction relief, but rather as a "gateway" which, when proven, allows a habeas court to review the merits of otherwise defaulted claims. <u>See, e.g.</u>, <u>Herrera v. Collins</u>, 506 U.S. 390, 416 (1993) ("Our federal habeas cases have treated claims of 'actual innocence,' not as an independent constitutional claim, but as a basis upon which a habeas petitioner may have an independent constitutional claim considered on the merits, even though his [claim] would otherwise be regarded as successive or abusive [or defaulted].").

The First Circuit has twice indicated that the actual innocence exception would apply to excuse procedural default and allow a court to consider otherwise-defaulted claims in a §2241 petition. <u>See</u> <u>Sustache</u>, 221 F.3d at 19 (affirming dismissal of §2241 petition based on failure to show "cause and prejudice" only after noting that petitioner "has not made a claim of actual innocence"); <u>Barrett</u>, 178 F.3d at 53 (noting, when affirming denial of the availability of §2241, that petitioner's "claim

does not raise a question of actual innocence").  These cases
persuade the court that a showing of "actual innocence" permits
at least the judicial review of otherwise defaulted claims.[11]

However, Goldman's case differs from the typical actual
innocence case in two ways.  First, Goldman claims actual
innocence not of the federal crime of which he was convicted, but
of a predicate state offense that added many years to his federal
sentence.  Second, the errors that Goldman claims led to his
improper sentence occurred not in the federal sentencing
proceeding, but rather in the state court proceeding that led to

_____

[11] Proof of actual innocence may also provide an independent
basis for relief to a habeas petitioner, particularly in the
capital context.  See House v. Bell, 547 U.S. 518, 554 (2006)
(noting that the Court in Herrera v. Collins, 506 U.S. 390 (1993)
left open whether "'in a capital case a truly persuasive
demonstration of 'actual innocence' made after trial would render
the execution of a defendant unconstitutional, and warrant
federal habeas relief'" (quoting Herrera, 506 U.S. at 417));
Conley v. United States, 323 F.3d 7, 14 n.6 (1st Cir. 2003)
("[i]t is not clear whether a habeas claim could be based on new
evidence proving actual innocence"); United States v. Sampson,
275 F. Supp. 2d 49, 74-79 (D. Mass. 2003) (noting that a majority
of Justices in Herrera agreed that execution of an innocent
person would be unconstitutional, which implies that a
meritorious freestanding claim of innocence would warrant
relief).
    In this case, Goldman's claim of actual innocence serves as
a gateway to excuse his procedural default and permit review of
his otherwise meritorious claim that his continued incarceration
following the vacatur of his state court conviction is unlawful
under Mateo and Pettiford.  Therefore, to decide this petition,
it is not necessary to resolve Herrera's open question regarding
whether and when a freestanding claim of actual innocence
provides an independent basis for postconviction relief.

his predicate conviction.    However, for the reasons described below, the court finds that the actual innocence doctrine applies in this case and operates to excuse Goldman's procedural default.

In the typical case, a habeas petitioner asserts actual innocence _of the crime of which he was convicted_ to excuse procedural default of a claim challenging the proceedings that led to that conviction.  _See, e.g._, _House_, 547 U.S. at 555 (finding petitioner had made a sufficient "gateway" showing of actual innocence of a capital murder charge to justify a remand to allow the district court to consider his defaulted constitutional claims challenging his murder conviction); _McCleskey_, 499 U.S. at 501 (considering but rejecting an actual innocence claim because petitioner had not made a sufficient showing of actual innocence of the capital crime of which he was convicted); _Schlup_, 513 U.S. at (considering petitioner's claim of actual innocence of the capital murder of which he was convicted).  The actual innocence doctrine has been applied in this way in both capital and non-capital cases.  _See, e.g._, _Bousley_, 523 U.S. at 623 (remanding for consideration of whether petitioner could show actual innocence of the non-capital federal drug crime of which he was convicted).

In this case, however, Goldman does not claim that he is

actually innocent of the federal drug crime for which he was convicted in 1993.   Rather, he contends that he is actually innocent of the kidnapping for which he was convicted in 1977 that served as the basis for enhancing his 1993 federal sentence. He, therefore, asserts actual innocence not of the crime of conviction, but of a fact that added seventeen to twenty years to his federal sentence.   The applicability of the actual innocence exception in this context is less well-established.

In Sawyer v. Whitley, 505 U.S. 333 (1992), the Supreme Court extended the actual innocence doctrine to permit consideration of defaulted claims in a challenge to a death sentence if a petitioner made an adequate showing that he was "actually innocent" of a factor necessary to make him eligible for the death penalty.   Id. at 347.

The Supreme Court has yet to rule on whether a showing of actual innocence of a non-capital sentencing factor can also serve as a gateway to review of otherwise defaulted claims.   In Dretke, the petitioner attempted to raise a procedurally defaulted claim that the evidence in his state court trial was insufficient to support his sentencing as a habitual offender. The Court noted:

> We are asked in the present case to extend the actual innocence exception to procedural default of

> constitutional claims challenging noncapital sentencing error.  <u>We decline to answer the question</u> in the posture of this case . . . .

<u>Dretke</u>, 541 U.S. at 393 (emphasis added).

Although <u>Dretke</u> left open whether the actual innocence exception applies to excuse default in the non-capital sentencing context, Supreme Court and circuit precedent support such an extension.  In <u>Dretke</u>, the majority did not find that the actual innocence exception could not be extended, or present any reason that it should not be extended, to non-capital cases.  The majority instead focused only on promoting an avoidance doctrine that required district courts to consider non-defaulted claims before addressing an actual innocence exemption to procedural defaults.  <u>See</u> <u>id.</u> at 388.

The purpose of the actual innocence exception justifies its extension to claims of non-capital sentencing error.  The Supreme Court has explained that the purpose of the actual innocence exception is to "'balance the societal interests in finality, comity, and conservation of scarce judicial resources'" that underlay the creation of the judge-made procedural default rules, "'with the individual interest in justice that arises in the extraordinary case.'"  <u>House</u>, 547 U.S. at 536 (quoting <u>Schlup</u>, 513 U.S. at 324).  "'In appropriate cases' . . . 'the principles

61

of comity and finality that inform the concepts of cause and prejudice must yield to the imperative of a fundamentally unjust incarceration.'"   Id. (quoting Carrier, 477 U.S. at 495).   An incarceration is equally unjust when premised on an erroneous sentence or an erroneous conviction.   See, e.g., Dretke, 541 U.S. at 398 (Stevens, J., dissenting on other grounds) (noting that when a prisoner's sentence is enhanced without a valid "factual basis," yet he remains incarcerated pursuant to that sentence "it follows inexorably" that he "is a 'victim of a miscarriage of justice,'" (quoting Wainright, 433 U.S. at 91)).

Therefore, the reasons that support the actual innocence exception apply equally when a petitioner asserts actual innocence of a fact or status that enhanced his sentence in a non-capital case.   As the Second Circuit has explained, "[t]he [Supreme] Court has made clear that the availability of actual innocence exception depends not on the 'nature of the penalty' the state imposes, but whether the constitutional error 'undermined the accuracy of the guilt or sentencing determination.'"   Spence v. Superintendent, Great Meadow Correctional Facility, 219 F.3d 162, 171 (2d Cir. 2000) (quoting Smith v. Murray, 477 U.S. 527, 538-39 (1986)).

Several circuits have held that the actual innocence

exception applies to sentencing factors in non-capital cases. See Spence, 219 F.3d at 171 ("Because the harshness of the sentence does not affect the habeas analysis and the ultimate issue, the justice of the incarceration is the same, there is no reason why the actual innocence exception should not apply to noncapital sentencing procedures."); United States v. Maybeck, 23 F.3d 888, 893 (4th Cir. 1994) ("[W]e see little difference between holding that a defendant can be innocent of the acts required to enhance a sentence in a death case and applying a parallel rationale in non-capital cases"); Haley v. Cockrell, 306 F.3d 257, 266 (5th Cir. 2002) vacated on other grounds at Dretke, 541 U.S. at 392. Some courts have questioned or limited this conclusion. See Embrey v. Hershberger, 131 F.3d 739, 741 (8th Cir. 1997) (en banc) (a person cannot be actually innocent of a non-capital sentence); United States v. Richards, 5 F.3d 1369, 1371 (10th Cir. 1993) (same).[12]  However, other courts that have questioned or limited the use of the actual innocence exception outside the capital sentencing context have emphasized that the

_____

[12] The Seventh Circuit initially held in Mills v. Jordan, 979 F.2d 1273, 1279 (7th Cir. 1992) that the actual innocence exception applied in the non-capital sentencing context. In Hope v. United States, 108 F.3d 119 (1997), however, the Circuit held that AEDPA's 1996 amendments to §2255 precluded resort to the exception to permit second or successive §2255 motions, but did not comment on the continued viability of the exception in other contexts.

exception exists when, as here, a petitioner challenges the imposition of a Career Offender enhancement.  See United States v. Mikalajunas, 186 F.3d 490, 495 (4th Cir. 1999) (limiting the actual innocence exception to "the context of eligibility for application of a Career Offender or other habitual offender guideline provision" but not non-factual challenges to the application of sentencing enhancements); Cristin v. Brennan, 281 F.3d 404, 422 (3d Cir. 2002) ("Those courts that have extended Sawyer's holding on the 'actual innocence' of a sentence have uniformly done so in the context of testing the factual findings on which a particular non-capital sentence is based, such as prior convictions.").

The Second Circuit's analysis in Spence persuasively supports application of the actual innocence exception in this case.  In Spence, the court considered a procedurally defaulted claim raised by a person incarcerated under a state court sentence that had been substantially increased based on the sentencing judge's finding that he had been arrested on a new charge after entering a guilty plea.  The petitioner claimed that he was "actually innocent" of the grounds for this enhanced sentence because he did not commit any new offenses after his plea and, therefore, that his enhanced sentence was unjust.  The

Second Circuit held that:

> [w]here a sentencing court relies on the commission of an act . . . as grounds for raising the defendant's sentence for the original conviction, a petitioner may properly challenge the conclusion that he committed the . . . act on the ground that he was actually innocent of it.  Giving petitioner an opportunity to make this showing on collateral review, even if procedurally defaulted on direct review, will prevent a quintessential miscarriage of justice: a person being punished for an act he did not commit.

Spence, 219 F.3d at 171-72.

Goldman is, in this respect, situated similarly to the petitioner in Spence.  He claims actual innocence of the alleged kidnapping for which he was convicted in 1977 that eventually led to the seventeen-to-twenty-year increase of his federal sentence. As in Spence, Goldman is entitled an opportunity to prove his claims.

Based on the rationale for the actual innocence exception as articulated by the Supreme Court and the circuit court decisions on the issue including Spence, this court finds that the actual innocence exception extends to excuse procedural default of claims related to non-capital sentencing factors and, therefore, may apply in this case.

Goldman's claim, however, differs further from the typical actual innocence claim and even the claim raised in Spence.  The typical actual innocence inquiry requires a petitioner to show

that "<u>but for a constitutional error</u>" no reasonable juror would have found him guilty of the offense.  <u>See, e.g.</u>, <u>House</u>, 547 U.S. at 536-37; <u>Sawyer</u>, 505 U.S. at 336.

The coupling of a constitutional error and evidence of actual innocence is required because without both elements "the presumed guilt of a prisoner convicted in state court counsels against federal review of defaulted claims." <u>House</u>, 547 U.S. at 537.  When a claim of constitutional error is raised, the "conviction may not be entitled to the same degree of respect as one . . . that is the product of an error-free trial." <u>Schlup</u>, 513 U.S. at 316.  Therefore, a petitioner is entitled to review of his defaulted claims after a sufficient showing of actual innocence.  <u>Id.</u>

The Second Circuit has implemented this rule by requiring that a petitioner raising an actual innocence claim assert, and ultimately prove, that a constitutional error "'preclud[ed] the development of true facts [or] result[ed] in the admission of false ones,'" thus leading to a questionable determination of innocence at the original trial.  <u>See</u> <u>Spence</u>, 219 F.3d at 170 (quoting <u>Smith</u>, 477 at 537-38) (first and third alterations added).

In the typical case, therefore, a habeas petitioner raises a

claim of actual innocence coupled with a claim of constitutional error <u>at</u> the proceeding that led to his likely wrongful conviction or sentence. <u>See, e.g.</u>, <u>Schlup</u>, (petitioner's showing of actual innocence would permit court to review defaulted claim of error at proceeding in which he was likely convicted wrongfully); <u>Spence</u>, 219 F.3d at 171 (petitioner's showing of actual innocence of fact necessary to support longer sentence would permit court to review defaulted claim of error at sentencing hearing in which longer sentence was imposed).

In this case, however, the central constitutional error that Goldman challenges is his incarceration for at least an additional seventeen years as a Career Offender based on a state conviction that was later vacated. He does not now allege any constitutional errors occurred at his 1993 sentencing that precluded an accurate determination of his guilt or innocence of Career Offender status at that time. Although he alleges various constitutional and other errors occurred at the 1977 proceeding that led to his conviction, including the ultimate deprivation of his right to direct appeal, he does not ask this court to decide the merits of those errors. This is because, as discussed earlier, these errors were appropriately raised and addressed in state court. <u>See</u> <u>Daniels</u>, 532 U.S. at 382.

This court finds that Goldman's claim of actual innocence is sufficiently related to asserted errors at his 1977 trial that application of the actual innocence doctrine to excuse his procedural default is permissible and appropriate. In vacating the 1977 conviction, the state court did not explicitly rule on whether Goldman's constitutional rights were violated by Justice Brogna during and/or after Goldman's trial. <u>See</u> Ex. 9 (<u>Commonwealth v. Goldman</u>, Nos. 54316, 54318) at 5, n.2. However, Justice Toomey concluded that "justice may not have been done," in part because Zalkind did not appeal Justice Brogna's decision that Goldman was guilty and Justice Brogna improperly allowed Zalkind to withdraw and denied Goldman the transcripts necessary to represent himself on appeal. <u>Id.</u> at 5-6.

The additional evidence in this case reinforces and magnifies the reasons to doubt that Goldman was provided due process in 1977. More specifically, there are substantial questions about whether Zalkind provided Goldman effective assistance of counsel, which the absence of a transcript makes impossible to answer authoritatively. Although a waiver was filed allowing Zalkind to represent Goldman and Mondello, there is no evidence that the risks of joint representation were explained to Goldman adequately to make that waiver knowing and

voluntary.  <u>See</u> Bristol County Docket May 18, 1977 ("Deft.'s Assent to Atty. Jack I. Zalkind to represent co-defendant Robert E. Mondello"); <u>United States v. Foster</u>, 469 F.2d 1, 5 (1st Cir. 1972).  Zalkind had a duty to pursue an appeal as requested by Goldman or at least preserve Goldman's right to an appeal.  <u>Cf.</u> <u>Anders v. California</u>, 386 U.S. 738, 744-45 (1967).  Goldman's <u>pro</u> <u>se</u> pretrial motion contending that he was improperly shown to witnesses who would be called upon to identify him at the trial before Justice Brogna may have proved meritorious on appeal.  <u>See</u> <u>Neil v. Biggers</u>, 409 U.S. 188, 199-200 (1972) (describing test to determine whether identification procedure is impermissibly suggestive); <u>Manson v. Brathwaite</u>, 432 U.S. 98, 114 (1977) (same).  Justice Brogna's denial of the motions that would have permitted Goldman to pursue an appeal with or without Zalkind's assistance may, as Justice Toomey noted, have been "self-serving" in that it insulated possible errors by the Justice from being reviewed and reversed.  Ex. 9 (<u>Commonwealth v. Goldman</u>, Nos. 54316, 54318) at 5, n.2.

In these circumstances, this court has no confidence in the correctness of Goldman's 1977 state court conviction.  As the newly discovered evidence analyzed below demonstrates, these legal errors cumulatively, even if not individually, are

fundamental and have resulted in a complete miscarriage of justice by causing Goldman to be sentenced to an extra seventeen to twenty years in prison for a crime of which he is actually innocent.   Therefore, any procedural default by Goldman is excused and §2241 provides a basis to review Goldman's claims. Cf. Mateo, 398 F.3d at 136.

Goldman's showing of actual innocence serves as a "gateway" to hear his otherwise defaulted claim that his 1993 sentence was improperly enhanced based on a state conviction that has since been vacated.   Such review appropriately gives Goldman a chance to correct the federal consequences of his 1977 conviction if he can demonstrate that this conviction, in addition to being unfair, as found by the state court in 2001, was also actually incorrect because he was truly innocent within the meaning of the law.   It also allows the actual innocence exception to serve its purpose of remedying the miscarriage of justice that would result from permitting Goldman's incarceration for at least an extra seventeen years based on a conviction for an alleged crime for which he did not receive a fair trial and for which he has provided compelling evidence of his actual innocence.   See Maybeck, 23 F.3d at 893-94 (applying the actual innocence exception to excuse procedural default of defendant's challenge

to Career Offender enhancement when his sole claim was actual innocence of a predicate conviction and he raised no claims of constitutional error at his federal sentencing proceeding or elsewhere).

For all these reasons, the court finds that the actual innocence exception applies to Goldman's claims.  Because the actual innocence exception applies and because Goldman presented a colorable claim of actual innocence, this court held an evidentiary hearing in March, 2008 to determine whether Goldman could demonstrate his actual innocence of the 1977 offense.[13]

    C.    <u>Goldman's Claim of Actual Innocence</u>

        1. <u>Standard for Showing Actual Innocence</u>

The Supreme Court's decisions in death penalty cases instruct that petitioners attempting to show actual innocence of a sentencing factor are held to a higher standard than those

---

[13] In 2005, the government argued in its initial brief in this matter that Goldman was not entitled to an evidentiary hearing because the existing record conclusively proved that he was not actually innocent and because Goldman had not raised any new evidence demonstrating his innocence.  <u>See</u> Gov't Mem. (May 31, 2005) at 15-16.  However, this court found that Justice Toomey's severe criticism of the 1977 proceeding in his 2001 decision on Goldman's motion for a new trial, coupled with Goldman's claim of innocence, which was supported by affidavits from him and a co-defendant, Mondello, raised a colorable claim of innocence that deserved to be tested at an evidentiary hearing.  <u>See</u> June 11, 2007 Hearing Tr. at 67-71.  Therefore, an evidentiary hearing was held.

attempting to show actual innocence of the offense. <u>See</u> <u>Calderon</u> <u>v. Thompson</u> 523 U.S. 538, 559-60 (1998) ("Although demanding in all cases, the precise scope of the miscarriage of justice exception depends on the nature of the challenge brought by the habeas petitioner."). To make an adequate showing of actual innocence <u>of the crime of conviction</u>, a petitioner must "establish that in light of new evidence, 'it is <u>more likely than</u> <u>not</u> that no reasonable juror would have found petitioner guilty beyond a reasonable doubt.'" <u>House</u>, 547 U.S. at 536-37 (quoting <u>Schlup</u>, 513 U.S. at 527). When contesting the imposition of the death penalty, however, a habeas petitioner must focus on the "elements which render a defendant eligible for the death penalty" and must show "<u>by clear and convincing evidence</u> that but for a constitutional error, no reasonable juror would have found the petitioner eligible for the death penalty." <u>Sawyer</u>, 505 U.S. at 336 (emphasis added); <u>see also</u> <u>Schlup</u>, 513 U.S. at 323 (noting this distinction). The one court to discuss explicitly what standard of proof applies to claims of actual innocence in the non-capital sentencing context applied the higher "clear and convincing" standard. <u>See</u> <u>Spence</u>, 219 F.3d at 172 ("[O]ur inquiry is then whether, by clear and convincing evidence, defendant has shown that [but for a constitutional error, no

reasonable juror would have found the petitioner guilty of] the act on which his harsher sentence was based."). This court too finds the clear and convincing standard to be applicable to a claim of actual innocence of a predicate crime that made the defendant a Career Offender.

The "clear and convincing" standard is "demanding," Spence, 219 F.3d at 172. Giving content to the standard in a context outside habeas, the Supreme Court has instructed the standard is met only when a party can "place in the ultimate factfinder an abiding conviction that the truth of its factual contentions are 'highly probable.'" Colorado v. New Mexico, 467 U.S. 310, 316 (1984) (quoting C. McCormick, Law of Evidence §320, p. 679 (1954)). The Court further elaborated that this would be the case only when "the material [one party] offered instantly tilted the evidentiary scales in [its favor] when weighed against the evidence [the other party] offered in opposition." Colorado, 367 U.S. at 316. The First Circuit has described the standard as "more than a preponderance but less than beyond a reasonable doubt." In re Pratt, 462 F.3d 14, 21 (1st Cir. 2006) (quoting Lamphere v. Brown Univ., 798 F.2d 532, 536 (1st Cir. 1986) for this definition); see also Buildex Incorporated v. Kason Industries, Inc., 849 F.2d 1461, 1463 (Fed. Cir. 1988) ("The

73

'clear and convincing' standard of proof . . . is an intermediate standard which lies somewhere between 'beyond a reasonable doubt' and a 'preponderance of the evidence.'" (quoting <u>Addington v. Texas</u>, 441 U.S. 418, 425 (1979)).

The Supreme Court has provided valuable guidance on how courts should apply the relevant standard of proof to the evidence presented in actual innocence cases. First, "'to be credible'", an actual innocence claim requires "new reliable evidence – whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence – that was not presented at trial." <u>House</u>, 547 U.S. at 537 (quoting <u>Schlup</u>, 513 U.S. at 324.). However, "the habeas court's analysis is not limited to such evidence." <u>Id.</u> Instead, the court must consider "'all the evidence,' old and new, incriminating and exculpatory, without regard to whether it would necessarily be admitted under 'rules of admissibility that would govern at trial.'" <u>Id.</u> at 538 (quoting <u>Schlup</u>, 513 U.S. at 327-28).

"Based on this total record, the court must make 'a probabilistic determination about what reasonable, properly instructed jurors would do.' The court's function is not to make an independent factual determination about what likely occurred,

but rather to assess the likely impact of the evidence on reasonable jurors." Id. (quoting Schlup, 513 U.S. at 329). "Because a[n actual innocence] claim involves evidence the trial jury did not have before it, the inquiry requires the federal court to assess how reasonable jurors would react to the overall, newly supplemented record. If new evidence so requires, this may include consideration of 'the credibility of the witnesses presented at trial.'" Id. (quoting Schlup, 513 U.S. at 330).

Reasonable, properly instructed jurors will presume the defendant is innocent and require that guilt be proven beyond a reasonable doubt. See, e.g., In re Winship, 397 U.S. 358, 361-64 (1970) (holding that presumption of innocence and reasonable doubt standard are constitutionally required in criminal cases). Therefore, "the [proper] inquiry . . . requires a holistic judgment about 'all the evidence' and its likely effect on reasonable jurors applying the reasonable-doubt standard." House, 547 U.S. at 539 (internal citation omitted) (quoting Schlup, 513 U.S. at 328-29).

The requirement of proof beyond a reasonable doubt imposes on the government a "strict and heavy burden." United States v. Cleveland, 106 F.3d 1056, 1067 (1st Cir. 1997). The First Circuit has indicated "what correctly convey[s] the concept of

reasonable doubt to the jury." <u>Id.</u> at 1062-63.  Such an instruction provides, in part, that:

> A reasonable doubt may arise not only from the evidence produced but also from a lack of evidence.  Reasonable doubt exists when, after weighing and considering all of the evidence, using reason and common sense, jurors cannot say that they have a settled conviction of the truth of the charge.

<u>Id.</u> at 1062;[14] <u>see also</u> <u>United States v. O'Shea</u>, 426 F.3d 475,

---

[14]The full instruction approved by the First Circuit provides:

> . . . [T]he burden is upon the Government to prove beyond a reasonable doubt that a defendant is guilty of the charge made against the defendant. It is a strict and heavy burden, but it does not mean that a defendant's guilt must be proved beyond all possible doubt. It does require that the evidence exclude any reasonable doubt concerning a defendant's guilt

> A reasonable doubt may arise not only from the evidence produced but also from a lack of evidence. Reasonable doubt exists when, after weighing and considering all the evidence, using reason and common sense, jurors cannot say that they have a settled conviction of the truth of the charge.

> Of course, a defendant is never to be convicted on suspicion or conjecture. If, for example, you view the evidence in the case as reasonably permitting either of two conclusions-one that a defendant is guilty as charged, the other that the defendant is not guilty-you will find the defendant not guilty.

> It is not sufficient for the Government to establish a probability, though a strong one, that a fact charged is more likely to be true than not true. That is not enough to meet the burden of proof beyond reasonable doubt. On the other hand, there are very few things in this world that we know with absolute certainty, and in criminal cases the law does not require proof that overcomes every possible doubt.

> . . . [W]hat the Government must do to meet its heavy burden is to establish the truth of each part of

482-83 (1st Cir. 2005).

Therefore, this court must consider all of the evidence, old and new, determine what evidence is credible, and decide if Goldman has provided such compelling proof of his innocence that he has shown by clear and convincing evidence that a fully informed, reasonable jury would have had at least a reasonable doubt concerning his guilt and, therefore, found him not guilty.

2.   <u>The Petitioner Has Met the High Standard for Obtaining Relief</u>

Goldman has met the high standard for obtaining relief.  As described below, he has presented reliable new evidence that was not available to Justice Brogna when he found Goldman guilty of kidnapping in 1977.  That evidence consists of trustworthy eyewitness accounts of three witnesses: DeLeo and Mondello, who each participated in the purported kidnapping, and Zalkind, who represented Goldman and his co-defendant Larkin at the 1977

---

each offense charged by proof that convinces you and leaves you with no reasonable doubt, and thus satisfies you that you can, consistently with your oath as jurors, base your verdict upon it. If you so find as to a particular charge against a defendant, you will return a verdict of guilty on that charge. If, on the other hand, you think there is a reasonable doubt about whether the defendant is guilty of a particular offense, you must give the defendant the benefit of the doubt and find the defendant not guilty of that offense.

<u>Cleveland</u>, 106 F.3d at 1062-63.

trial.[15]   Each of these witnesses corroborates the testimony of the other and the trustworthiness of that testimony is reinforced by other evidence as well.   Considering the credible new evidence that exculpates Goldman in the context of the evidence presumably presented at his 1977 trial that suggests he was guilty of the purported Lopes kidnapping, this court is clearly convinced that no fully informed and properly instructed juror would have found Goldman guilty of that alleged crime.   Therefore, he has made a sufficient showing of actual innocence to permit this court to consider his otherwise defaulted claim and grant him relief under

---

[15]In deciding whether particular evidence is trustworthy, the court has performed in the manner of jurors, who are instructed that:

> In deciding what the facts are, you may have to decide what testimony you believe and what testimony you do not believe. You may believe everything a witnesses says or only part of it or none of it.
>
> In deciding what to believe, you may consider the number of factors, including the following (1) the witness' ability to see or hear or know the things the witness testifies to; (2) the quality of the witness's memory; (3) the witness's manner while testifying; (4) whether the witness has an interest in the outcome of the case or any motive, bias or prejudice; (5) whether the witness is contradicted by anything the witness said or wrote before trial or by other evidence; and (6) how reasonable the witness's testimony is when considered in the light of other evidence which you believe.

First Circuit Pattern Jury Instruction 1.06.   Also like jurors, the court has considered what weight to give to each piece of credible evidence.

§2241.

As explained earlier, there is no transcript of the 1977 trial at which Goldman was convicted and none can now be prepared. The information that tends to prove Goldman guilty is primarily in two police reports which would not have been admissible at trial. See Fed. R. Evid. 801; United States v. Vigneau, 187 F.3d 70, 75-77 (1st Cir. 1999) (discussing the "hearsay within hearsay" problem presented by police reports); United States v. Patrick, 248 F.3d 11, 22 (1st Cir. 2001) (same). However, such information can be properly considered in this proceeding. See House, 547 U.S. at 537. Goldman agreed to its admission to provide this court with the fullest possible record. The information in the two police reports indicates that the following inculpatory evidence concerning Goldman was presumably presented at the 1977 trial.

On the evening of November 24, 1975, Jeffrey Lopes reported to the State Police that earlier that day three men had kidnapped him from the Stadium Cafe in New Bedford. Ex. 2 at 27.[16]  The next day Lopes gave the State Police a longer statement. Ex. 2 at 27. In the absence of a transcript, the court assumes that

---

[16] Throughout, the page numbers used for Exhibit 2 are the fax page numbers that appear in the upper right corner of the Exhibit and which start on the first page with number "4".

his 1977 trial testimony and the related evidence at trial was consistent with the information which is in the police reports.

Lopes initially arrived at the Stadium Cafe at approximately 7:15 a.m. on November 24, 1975 to meet an associate, Jimmy Soohoo.  Ex. 3 at 1.  As he arrived at the Cafe, he saw three men trying the front door.  Id.  After finding it locked, the three men got into a grey Pontiac and eventually left.  Id.  The police later determined that a grey Pontiac had been rented by Larkin on November 22, 1975, and returned on November 25.  Ex. 2 at 19; Ex. 3 at 34.

Lopes left the Stadium Cafe soon after 7:15 a.m. and returned at about 11:30 a.m.  Ex. 3 at 1.  Lopes and other witnesses stated that at about 12:00 noon two men entered the Stadium Cafe and asked to speak to Lopes.  Id. (Lopes); id. at 11-12 (other witnesses).  The men proceeded to a back room from which they eventually emerged with Lopes.  Id. at 1.

On November 25, 1975, Lopes described the two men who entered the Cafe.  One was a white male, approximately 5'7" tall, 150-160 pounds, thirty-eight to forty-two years old, wearing a fake nose, fake scar, sunglasses, and a black coat and black felt hat.  Id.; see also Ex. 2 at 27.  The other was a white male, approximately 6' tall, 190-200 pounds, approximately thirty to

forty years old, wearing a black leather coat and hat and brown gloves.  Ex. 3 at 1

According to Lopes, once in the back room the taller man said to him, "You've just been kidnapped." Id. at 2.  That man showed Lopes a .38 caliber revolver that had been in his pocket and stated, "Don't start any trouble or we will kill you or any one who gets in the way." Id.; see also Ex. 2 at 28.

According to Lopes and other witnesses, Lopes and the two men exited the Stadium Cafe and got into a car.  Lopes described this car as a yellow Ford Torino. Ex. 3 at 2.  It was later determined that this vehicle had been rented from Econo-Car by Mondello. Id. at 8.

Lopes once described the driver of the car as a thirty to thirty-three year old male, approximately 5'8" tall, 165-170 pounds, with light hair, wearing white driving gloves, and a white or yellow stocking cap. Id. at 2.  Another police report stated that Lopes described the driver as "wearing white gloves and something like a stocking hat, white, yellow, and red colors in it.  He looked like he was about 32 years old." Ex. 2 at 28. Goldman was thirty-two years old and had light brown hair, which he wore in a large "Afro" style. See PSR at 1 (stating Goldman's date of birth is October 13, 1943 which would have made him 32 in

November, 1975); Ex. 3 at 37 (describing Goldman's hair at the time).

Other witnesses also described the men who came to the Cafe. Claudio Dragon, an employee of the Stadium Cafe, stated that he saw two men wearing leather coats and sunglasses approach the locked Cafe door at about 7:20 a.m.  Ex. 3 at 12.  The Stadium Cafe janitor had told him that these two men returned at approximately 8:00 a.m, while Dragon was at the store.  Id.  At about 12:00 noon, Dragon saw the same two people he had seen earlier that morning enter the Cafe and tell Lopes that they wanted to speak with him.  Id.  Dragon then saw Lopes leave with these men.  Id.

Dragon described the two men who entered the Cafe as follows.  He said one was a white male, approximately 6' tall, wearing a brown leather coat, gloves, sunglasses and a dark hat, and the other  white male approximately 5'7" with a fake-looking scar on his face, a "funny-looking nose," and long hair in a "Dutch" style, wearing a black leather coat and hat, black gloves, and sunglasses.  Id. at 13.  Dragon identified photographs of Mondello and Larkin as the two men he saw in the Cafe.  Id. at 11.

Dragon said that there was another man driving a yellow Ford

82

that Lopes and the other men entered, but that he did not get a good look at the driver. Id. at 13.

The bartender at the Stadium Cafe identified a photograph of Mondello as one of the men who had taken Lopes out of the Cafe. Id. at 11. Lopes' nineteen-year-old sister, who was also working the bar on that day, picked out a picture of Larkin as being one of the men with whom Lopes left the bar. Id. at 11.

Two other witnesses provided similar descriptions of the two men who had entered the Stadium Cafe. See id. at 15-16. A witness who was in kitchen with Lopes described them as white men wearing coats, hats and sunglasses, one of whom had a scar. Id. at 15; Ex. 2 at 31. A diner at the Cafe, Butch Machado, described two men in similar clothing, saying both had dark hair and one looked close to forty years old and like a "business man type." Ex. 3 at 16; see also Ex. 2 at 30 (additional witnesses).

No witness identified Goldman as one of the men who entered the Stadium Cafe and left with Lopes. Nor did any witness except, the court infers, Lopes identify Goldman as the driver of the Ford.

According to Lopes, from the Stadium Cafe he and the three men drove east, eventually stopping at a service station on the same street as the Cafe. Ex. 3 at 2. Lopes was then forced to

get on the rear floor of a grey two-door Pontiac Catalina.   Id.
He stated that the driver of the yellow Ford left the scene, and
Lopes was driven away by the original two men from the Stadium
Cafe.   Id.   Lopes stated that while in this car, the driver
threatened him with a gun and one of the men said that "they had
a contract for him from Providence."   Id.   The court understands
"Providence" to refer to the Patriarca Family of La Cosa Nostra,
which is also known as the Mafia.

Lopes stated that after driving west on Route 195, they got
out of the car on the side of the road, and entered the yellow
Ford in which they had left the Stadium Cafe.   Id.   It had the
same driver.   Id.   Lopes stated that, at this point, he was
blindfolded with brown paper and tape, and was given sunglasses
and a hat.   Id.   According to Lopes, the group then drove
further, stopping to eat and so that the men could purchase
pillows and a blanket that they told Lopes were to be used when
they put him into the trunk.   Id. at 3.   Blankets were later
found in the trunk of the yellow Ford rented by Mondello.   Id.

According to Lopes, the group then drove for two more hours,
at some point discussing how much money Lopes could get the group
for his release.   Id.   They then got into a small, four-door
station wagon.   Id.   After a short drive, however, this vehicle

84

broke down on the side of the road in a sudden snowstorm. Id. at 4. Lopes said that he overheard the group talking about a State Trooper and that the group eventually pushed the car to the side of the road while Lopes was on the floor inside.  Id.

Roger O'Brian, the operator of O'Brian's Garage in Brockton, Massachusetts, said that he had been asked by the State Police to tow from Route 24 a number of vehicles that had been disabled in the snowstorm. Id. at 10.  One of the vehicles towed was an AMG Rambler registered to Mondello.  Id.

According to Lopes, after the vehicle was pushed to the side of the road, the group walked across the highway and entered a lounge. Id. at 4.  Lopes had a Chivas Regal in the lounge.  Id.

This lounge was later identified as the Carlton House in Brockton.  On December 8, 1975, Eleanor Corson, a waitress at the lounge recognized Lopes, who was with the officers who interviewed her, as having been at the Carlton House lounge on November 24, 1975 with "bandaged eyes."  Ex. 2 at 35.  She remembered serving Lopes a Chivas Regal and that the men with Lopes had told her that he recently had an eye operation.  Id. Corson picked out photographs of Larkin and Alexander Affleck as resembling the two men she recalled being with Lopes in the lounge.  Id.  She did not identify Goldman as a person who was

85

with Lopes.

Lopes said that at about 4:50 p.m. he and the men left the lounge and entered a room at the Carlton House where Lopes was able to dry his sneakers on a heater.  Ex. 3 at 4.  A desk employee at the Carlton house "vaguely remembered" three men walking toward rooms of the hotel, with two men holding the arms of the third.  Ex. 2 at 36.  Larkin's fingerprints were found in a room at the Carlton House.  Ex. 3 at 10.  Goldman's fingerprints were not found there.

According to Lopes, one of the men left the motel room saying he was going to "go[] across the street to see if he could get the car towed."  Id. at 4.  Lopes said that after about thirty minutes in the room, someone knocked on the door, and the group left and got into a "four-door big car" in which there now appeared to be four men in addition to Lopes.  Id.

Lopes said that he was then driven for another forty-five minutes before he was dropped off at the Dartmouth Mall.  Id. at 5.  Before leaving Lopes, the men told him that he should go see his father in prison to try to get money, and that the men would call him the next day at 4:00 p.m. to arrange for the delivery of the money.  Id.  Lopes said that the men threatened to kill him or a family member if he did not comply with their demand.  Id.

86

According to Lopes, after taking a cab back to the Stadium Cafe, he went to see his father in prison.  Id.  His father told Lopes to contact the State Police.  Id.  Lopes did so, leading to his interview on the morning of November 25, 1975.  Id.

The State Police put a recording device on Lopes' telephone and recorded a call at 3:40 p.m. on November 25, 1975.  A male instructed Lopes to be at a pay phone near the Stadium Cafe in ten minutes to receive further instructions.  Id.  Lopes went to this location with the State Police.  At 4:10 p.m., he  received a call on the pay phone in which the same male directed him to go to another pay phone off Route 44 in Taunton and await a call at 5:00 p.m.  Id. at 6.  Lopes went to this location with the State Police and received a third call during which the same male instructed him to take the bag of money, walk fast across Route 44, and deposit the bag next to an office trailer in a K-Mart shopping complex.  Id.  Lopes did so while being surveilled by the officers.  Id.

Lopes returned to his car after depositing the money.  Id. The officers observed two men, both approximately 5'8" tall, walk toward the trailer.  Id.  As these men were approached by officers, they ran across the highway, jumped a ten-foot-tall barbed-wire fence, landed in a lumber yard, and disappeared.  Id.

Subsequently the officers observed a white car drive toward and stop near the trailer.  _Id._  A man with a white raincoat exited and walked toward the trailer.  _Id._  Lopes exclaimed "that's the man with the scar who kidnapped me."  _Id._  The officers arrested the man, who was Larkin.  _Id._ at 7.

Inside the white car that Larkin was driving, the officers found a loaded .38 revolver.  _Id._  The officers impounded the white car and discovered that it was registered to a Boston Econo-Car.  _Id._  Econo-Car reported that the car had been rented on November 25, 1975 by Mondello, who had also rented a yellow Ford Torino from the same business the previous day.  _Id._ at 8.  An employee of Econo-Car stated that a man who identified himself as Mondello had called the Econo-Car to ask whether they had heard anything about the rented white car because, Mondello said, he had lent it to a friend and had heard it was in an accident.  _Id._  A warrant was then issued for Mondello's arrest.  _Id._

On December 8, 1975, the operator of the Amoco gas station down the street from the Carlton House told the officers that a man came to his station, presumably on November 24, 1975, seeking to have a car towed from the Route 123 exit ramp off Route 24.  Ex. 2 at 36.  Since he was busy, the operator called Ronald Terry of Ronnie's Sunoco, which was nearby.  _Id._  Terry came to the

Amoco station to speak to the man, who told Terry where to find the car and left the key with him.  _Id._  This man then "ran across Belmont Street toward the Carlton House."  _Id._  Terry picked out a photograph of Goldman as the man who handed him the key and told him to pick up the vehicle.  _Id._  Terry also stated that "he remembered the man wearing a stocking cap and he recalled the colors green and red in it."  _Id._  Terry said the man spoke in an excited manner.  _Id._

Terry was not able to find the vehicle because it had already been towed at the direction of the State Police to O'Brian's service station.  _Id._  Terry so informed a man who called him that evening to inquire about the car.  _Id._

Only limited evidence contained in the police reports, and presumably offered at the 1977 trial, implicates Goldman in the alleged kidnapping.  Terry identified Goldman as the man who gave him the keys to the towed vehicle on November 24, 1975.  _Id._

Steve LeBlanc, an employee of O'Brian's Garage in Brockton, told police that he had towed the green Rambler station wagon, later identified as Mondello's vehicle, from Route 24 to O'Brian's Garage.  _Id._ at 37.  LeBlanc identified Goldman as having come to the garage with a roll of bills to request various repairs to that vehicle on November 25, 1975. Ex. 3 at 10; Ex. 2

89

at 37.   LeBlanc identified Mondello as having actually picked up the vehicle on November 26, 1976.  Ex. 3 at 10; Ex. 2 at 37.

Richard Leedberg, another employee of O'Brian's Garage, also picked out a photograph of Goldman as resembling a man who came to the garage on November 25, 1975 and said he was the owner of the green Rambler station wagon.  Ex. 2 at 37.  He recalled that this man had "strawberry blond" hair in an Afro and was wearing a stocking cap that had red in it.  Id.

These are the only witness identifications of Goldman contained in the police reports.  As indicated earlier, no one identified Goldman as being either in the Stadium Cafe or Carlton House.  However, Lopes' description of the man who was driving the yellow car outside the Stadium Cafe was similar to the description given by the gas station employees who identified Goldman.  Ex. 3 at 2.  Lopes described the driver as a "30-33 year old male, approximately 5'8" tall, 165-170 pounds, with light hair, wearing white driving gloves, and a white or yellow stocking cap".  Soohoo described the driver of the yellow car as "blond headed guy young."  Ex. 2 at 31; but see Ex. 3 at 14 (describing statements from Soohoo and not including any descriptive information about the driver).

After executing a search warrant at Goldman's mother's

house, where Goldman lived, police found make-up, Ex. 3 at 10, which conceivably could have been used to make the fake nose or fake scar reported by some of the witnesses.   The make-up also could have belonged to Goldman's mother.

On February 17, 1976 Goldman was indicted in Bristol Superior Court for kidnapping and attempt to commit a crime, extortion.   See PSR ¶67; Ex. 4, Bristol County Docket.   Goldman was charged and tried with Mondello and Larkin.   He was prosecuted by O'Boy.   See, e.g., Mar. 5, 2008 Tr. at 9-10 (Test. of O'Boy).   Goldman was represented at trial by Zalkind, who also represented Mondello. Ex. 4, Bristol County Docket May 18, 1977 ("Deft's Assent to Atty. Jack I. Zalkind to represent co-defendant Mondello"); Mar. 18, 2008 Tr. at 21 (Test. of J. Zalkind).   Larkin was represented by Harvey Brower.   Mar. 18, 2008 Tr. at 22 (Test. of J. Zalkind).

The 1977 docket of the case indicates that an initial trial began before Bristol Superior Court Judge Keating, but ended in a mistrial on May 19, 1977.   Bristol County Docket May 19, 1977 ("Mistrial Declared").   According to O'Boy, this first trial was a jury trial.   Mar. 5, 2008 Tr. at 9.   He recalled that the mistrial was a result of "an interplay between Judge Keating and counsel for one of the defendants."   Id.

91

However, it appears that the mistrial may have resulted from the fact that some identification witnesses were allowed to see Goldman prior to their testimony.  Even if this was not the cause of the mistrial, at some point Goldman at least was "shown or he was brought out before one of the identifying witnesses who had an opportunity to see him before identifying him in court."  Mar. 18, 2008 Tr. at 26-27 (Test. of Zalkind).

After the declaration of the mistrial and before the start of the second trial before Justice Brogna, Goldman filed a pro se Motion to Suppress Identification Testimony and Affidavit.  Bristol County Docket June 8, 1977 Entry.  This motion requested that any identification testimony from Lopes or other witnesses be suppressed.  Ex. 18 (Def.'s Pro Se Mot. To Suppress).  Goldman asserted that these witnesses were sworn in "en masse" on May 18, 1977, while Goldman was present in the courtroom.  Id.  Goldman also stated that he was "paraded" before these witnesses in a corridor on May 19, 1977, which would improperly aid in their identification of him.[17]  Id.  The docket indicates that before the second trial "Defendant's Motion #5" was allowed, but it cannot be determined whether this motion was Goldman's pro se

---

[17] According to Goldman's motion to suppress, the "parade" occurred on May 19, 1977.  Therefore, it could not have been the basis for the May 18, 1977 declaration of a mistrial.

motion to suppress or another motion.   Based on Goldman's 1977
motion and Zalkind's testimony, this court finds that Goldman
was, prior to the trial at which he was convicted, improperly
exposed to at least one witness who may have identified him at
that trial.   Therefore, the weight given any such testimony would
be reduced by any reasonable jury.   See, e.g., Ninth Circuit
Model Crim. Jury Instr. §4.14 (2003) (suggesting, as part of the
model instructions proposed for criminal cases involving
identification testimony, that jurors be instructed to consider
"whether the identification was the product of the eyewitness's
own recollection or was the result of subsequent influence or
suggestiveness" when deciding how much weight to give
identification testimony); United States v. Henderson, 320 F.3d
92, 109 (1st Cir. 2003) (upholding a jury instruction regarding
identification testimony that "suitably focused on the
reliability of the identification"); 001-2 Massachusetts Jury
Instructions (Criminal), No. 2-13 ("If the identification by the
witness may have been influenced by the circumstances under which
the defendant was presented to [him] [her] for identification,
you should scrutinize the identification with great care.").

     After the mistrial, Larkin, Mondello, and Goldman were tried
jury-waived by Justice Brogna.   Bristol County Docket Jul. 26,

1977 ("Deft.'s Waiver of Trial by Jury"), Aug. 5, 1977 (Court Finding of Guilty, Brogna, J.); Mar. 5, 2008 Tr. at 9 (Test. of O'Boy); Mar. 18, 2008 at 21 (Test. of Zalkind).   Goldman was found guilty.   Bristol County Docket Aug. 5, 1977 (Court Finding of Guilty, Brogna, J.).   Justice Brogna sentenced him to a term of not more than ten or less than five years to be served concurrently with a sentence Goldman was already serving at the time of his conviction.   Bristol County Docket Aug. 5, 1977 (Sentence); PSR ¶69.   As a practical matter, Justice Brogna's sentence did not extend the term of Goldman's imprisonment or have any other consequences in 1977.

Zalkind advised Goldman that "it would be foolish to spend the money for an appeal, and [] advised him not to appeal" since the concurrent sentence imposed by Justice Brogna "wouldn't have any effect on the further incarceration of [] Goldman at that time." Mar. 18, 2008 Tr. at 30 (Test. of Zalkind).   Nevertheless, Goldman filed a Pro Se Claim of Appeal (Docket Aug. 12, 1977), an Appeal from Sentence (Docket Aug. 15, 1977), a Motion to Revoke and Revise (Docket Aug. 26, 1977), a Motion for Free Transcripts (Docket Sept. 28, 1977), a Petition for a Writ of Habeas Corpus ad Testificandum (Docket Sept. 28, 1997), and a Motion for Appointment of Counsel (Docket Sept. 28, 1977).

94

As described earlier, Justice Brogna, without holding a hearing, denied Goldman's Motion to Revoke and Revise, his Motion for Appointment of Counsel, his Motion for a Transcript, and his Petition for Habeas Corpus ad Testificandum. Bristol County Docket Oct. 19, 1977. In a letter to the clerk, Justice Brogna explained that the motion for counsel was being denied because Zalkind had not been allowed to withdraw as Goldman's counsel, and that Goldman's pro se motion for transcripts was being denied because:

> The defendant's attorney of record has not asked for a transcript. Furthermore, I consider the claim of appeal to be completely frivolous. The evidence at trial, which took two weeks, was overwhelming against Mr. Goldman. Furthermore, he was apprehended by the police at the place where the supposed ransom money was to be dropped off.

Ex. 21 (Letter from J. Brogna to Clerk, Oct. 14, 1977) at 1.

It is evident to this court that in making his decisions Justice Brogna had confused Goldman with Larkin, who was the only defendant arrested at the place where the supposed ransom money was to be left. There was substantial evidence of Larkin's involvement in the purported kidnapping of Lopes in addition to his identification by Lopes and his apprehension where the money was being delivered. Dragon and Lopes' sister identified Larkin as being at the Stadium Cafe. The grey Pontiac seen there was

95

registered to Larkin.  In addition, Larkin was identified as being at the Carlton House and his fingerprint was found there.

In contrast, according to the police reports, no one identified Goldman as a person who was involved in any way other than dealing with the disabled vehicle.  The person who drove from the Stadium Cafe was characterized as having light hair. Goldman had light hair, but also a large "Afro," which no witness, including Lopes, mentioned.  The driver was, according to Lopes, wearing a multi-colored stocking cap.  Goldman was described as wearing a similar cap while dealing with the disabled vehicles.  However, such caps were then common.  In contrast to Larkin, Goldman was not identified as being at the Carlton House and his fingerprints were not found there.

Although not in the police reports, the court assumes that Lopes identified Goldman as one of the kidnappers at the trial before Justice Brogna.  However, the court concludes that Lopes had seen Goldman in connection with the earlier trial.  More significantly, as described below, there is substantial, new credible evidence that Lopes was lying both about whether there was a genuine kidnapping and Goldman's involvement in it.

As explained earlier, the court is required to consider the credibility of the witnesses presented at the trial in 1977 and

the credibility of the new evidence presented in this proceeding. See House, 547 U.S. at 538-39.

The primary witness against Goldman at the 1977 trial must have been Lopes. Based on the information in the police reports, Lopes was the sole witness who could have identified Goldman as being involved in the events of November 24, 1975 in any way other than dealing with the vehicle which broke down. Although Larkin and Mondello were identified as participants by witnesses from the Stadium Cafe, Goldman was not. Again, in contrast to Larkin, Goldman was not identified as being at the Carlton House or captured at the site at which the money was to have been left. Therefore, Lopes' testimony against Goldman was crucial to his conviction.

The prosecutor at the 1977 trial, O'Boy, testified in these proceedings that based on a range of experiences he believes that Lopes, who is now deceased, was a "despicable" person. Mar. 5, 2008, Tr. at 13, 67. The testimony of credible witnesses in this matter provides consistent and persuasive evidence that the purported kidnapping was a hoax and, therefore, that Lopes' testimony that he was a victim constituted perjury. The evidence demonstrates that, because of a drug debt or his robbing of high-stakes card games, Lopes owed money to some dangerous people and

97

participated in a phony kidnapping scheme to dupe his father into paying off his debt. A witness willing to lie about whether he was actually kidnapped would also lie about the identity of his purported kidnappers. Lopes had a motive to accuse Goldman rather than DeLeo, who the evidence now clearly and convincingly shows was involved in the events of November 24 and 25, 1977, because DeLeo then had a reputation for violence that Goldman had not earned. See Mar. 3, 2008 Tr. at 41, 66.

Lopes' likely testimony concerning Goldman, and the other information that tends to corroborate it, is substantially outweighed by the credible, new exculpatory evidence presented to this court.

DeLeo was a reluctant, but ultimately credible witness in the proceedings in this case. He did not participate voluntarily. See Mar. 3, 2008 Tr. at 9, 60, 62-63 (Test. of DeLeo).[18] DeLeo was contacted by Goldman's attorney approximately four to six months prior to the March, 2008 evidentiary hearing. See id. at 61-62; Mar. 19, 2008 Tr. at 3. As a result, DeLeo consulted Zalkind concerning whether the

---

[18] DeLeo first provided evidence at a pretrial deposition held in court on March 3, 2008. The testimony he gave at this deposition was adopted by him during his testimony at the evidentiary hearing and, therefore, made part of the evidentiary hearing record. See Mar. 19, 2008 Tr. at 5-6.

statute of limitations protected him from possible prosecution for the purported kidnapping of Lopes in 1975.  Mar. 19, 2008 Tr. at 33 (Test. of DeLeo); Mar. 18, 2008 Tr. at 190.[19]   He also retained counsel and contemplated asserting a Fifth Amendment privilege not to testify.  See Mar. 19, 2008 Tr. at 31-33 (Test. of DeLeo); Mar. 3, 2008 Tr. at 3-8, 38-39, 63.

Although DeLeo and Goldman were once close, DeLeo has been unhappy with Goldman since Goldman's wife had an affair with DeLeo's brother many years ago.  Mar. 3, 2008 Tr. at 59-60. DeLeo and Goldman have not spoken or otherwise communicated since the mid-1970s, except for a brief telephone call in 1997 during which they did not discuss the 1975 kidnapping.  See id. at 42, 58-60.

DeLeo is now a property manager and concerned about the damage his involvement in this matter may do to his reputation. Id. at 62, 66.  However, ultimately DeLeo decided it would not be right to allow Goldman to spend many more years in prison for DeLeo's conduct.  Id. at 64.  Therefore, DeLeo testified – the court finds truthfully – in this matter.[20]   His credible

_____

[19] DeLeo waived his attorney-client privilege to permit Zalkind to provide some of this testimony.  Mar. 18, 2008 Tr. at 190.

[20] Many of the details of DeLeo's testimony were corroborated by the police reports, Exhibits 2 and 3, and by Mondello.  The court finds that DeLeo did not learn those details from the

testimony was as follows.

In the 1970s Brower was a criminal defense lawyer who was closely associated with Raymond Patriarca, the Boss of the La Cosa Nostra Family in New England. <u>Id.</u> at 53; Mar. 19, 2008 Tr. at 42. Brower was later convicted of unlawfully conspiring to aid and abet the crime of bail jumping. <u>See</u> <u>United States v.</u> <u>Marino</u>, 617 F.2d 76, 78 (5th Cir. 1980); Mar. 3, 2008 Tr. at 54 (Test. of DeLeo); Mar. 18, 2008 Tr. at 44-45 (Test. of Zalkind).[21] Brower is now deceased.

In 1975, Brower knew Jeffrey Lopes' father, an incarcerated bookmaker who was also associated with Patriarca. Mar. 3, 2008 Tr. at 13, 28, 39, 52; Mar. 19, 2008 Tr. at 42. Jeffrey Lopes owed a substantial sum of money to people known to Brower. Mar. 3, 2008 Tr. at 13. Brower developed a scheme to purportedly kidnap Jeffrey Lopes and get a payment from his father for his return and safety, which would eliminate Jeffrey Lopes' debt. <u>Id.</u> at 13-15, 28, 36, 39-40, 52; Mar. 19, 2008 Tr. at 40-42. Jeffrey Lopes agreed to the scheme. Mar. 3, 2008 Tr. at 13-14, 28-29.

Brower recruited DeLeo, who had recently been released from

---

police reports or Mondello.

[21] Brower was also later tried on fraud and extortion charges, but was acquitted. <u>See</u> <u>United States v. Kattar</u>, 840 F.2d 118, 122 (1st Cir. 1988).

prison, to lead the purported kidnapping. DeLeo recruited Larkin and Mondello to assist him. Id. at 40.

DeLeo, in disguise, Mondello and Larkin went to the Stadium Cafe on November 24, 1975. Id. at 9-12, 36. As discussed earlier, several witnesses identified Larkin and Mondello as being at the Cafe. Lopes left the Cafe with two of the men, one of whom was DeLeo. Id. at 11-12. Paper patches, which Lopes could remove, were placed over Lopes' eyes. Id. at 23. Mondello's vehicle in which the four men were traveling broke down in a snowstorm, on or near Route 24 in Brockton, Massachusetts. Id. at 19-24. A State Police officer helped move it to the side of the road. Id. at 21.

The four men walked to the nearby Carlton House. Id. at 21-22. They waited in the bar, where DeLeo remembers Lopes' having an expensive drink. Id. at 24. Mondello went to make arrangements for the disabled vehicle. Id. at 27. Larkin called his girlfriend, an exotic dancer named Lisa, to pick the four men up. Id. at 26.

Lisa came to the Carlton House. With Lopes' eyes still covered with patches, they all left. Id.[22] Lopes was dropped

---

[22] The court infers that Lopes was correct that, while his eyes were covered, he left the Carlton House with four people. See Ex. 3 at 4. However, the court finds that the fourth person was Lisa, rather than Goldman.

off so he could try to get money from his father to pay for the protection he purportedly required.  Id. at 27.

Evidently Lopes' father refused to pay.  Not knowing this, DeLeo made a series of calls to Lopes to arrange for a drop of the money DeLeo expected to collect.  Id. at 29-30.  Larkin drove DeLeo and Mondello to the drop site.  Id. at 30-31.  When DeLeo and Mondello went to pick up the money, the police appeared.  Id. at 31.  Larkin was arrested.  Id. at 33.  DeLeo and Mondello climbed two fences, ran through a lumber yard, and then continued running for hours to escape.  Id. at 31-33.

Mondello was arrested on December 1, 1975, id. at 35, apparently after he called the Econo-car to inquire about the vehicle he had rented which Larkin was driving when he was arrested.  See Ex. 3 at 8.  Goldman, who was identified by the garage operators he dealt with in arranging for the tow and repair of Mondello's vehicle, was also arrested and charged.  See Mar. 3, 2008 Tr. at 10-11 (Test. of DeLeo).

Brower became Larkin's lawyer, and Zalkind represented Goldman and Mondello.  Id. at 37; Mar. 18, 2008 Tr. at 21-22 (Test. of Zalkind).  DeLeo attended several of Goldman's meetings with Zalkind.  Mar. 3, 2008 Tr. at 37-38, 47-48 (Test. of DeLeo).

DeLeo paid Brower $10,000 to take care of the case against

102

the three defendants.  Id. at 49; Mar. 19, 2008 Tr. at 43-45.
DeLeo understood that Brower was going to give the money to
Anthony St. Laurent, another associate of Patriarca's, and that
the case would be dropped.  Mar. 19, 2008 Tr. at 43-45, 27-28.
Without providing these details, DeLeo told Goldman not to worry.
Mar. 3, 2008 Tr. at 49.

DeLeo met with Lopes, who suggested that DeLeo should be
pleased that Lopes did not implicate him.  Id. at 34, 37.  DeLeo
went to the courthouse for Larkin's arraignment and for the 1977
trial.  Mar. 19, 2008 Tr. at 33-4, 46 (Test. of DeLeo); see also
Mar. 18, 2008 Tr. at 61 (Test. of Zalkind).  However, DeLeo left
the arraignment and trial when he felt that the State Police and
others were looking at him suspiciously.  Mar. 19, 2008 Tr. at
46; Mar. 3, 2008 Tr. at 33-34.

DeLeo was subsequently convicted of murder in another case
and was released from prison in 1997.  Mar. 3, 2008 Tr. at 65.
Aside from a shoplifting charge immediately after his release
from prison in 1997, DeLeo has not been arrested or convicted
since.  Id.

As described earlier, DeLeo did not participate voluntarily
in this matter.  However, after being contacted by Goldman's
counsel he was subpoenaed, his deposition was taken, and he

testified further at the March, 2008 evidentiary hearings.  He understands that the statute of limitations bars his prosecution for the 1975 events concerning Lopes, but that he could be prosecuted for any perjury committed before this court. Therefore, he had an incentive to testify truthfully.  Cf. United States v. Millan, 230 F.3d 431, 438 (1st Cir. 2000) (affirming that a prosecutor may inform jury of facts that give witness incentive to testify truthfully, such as existence of plea agreement requiring truthful testimony).

The court concludes that DeLeo's testimony about his role and Goldman's lack of involvement in the purported Lopes' kidnapping is not a false, recent contrivance.  DeLeo's demeanor, his recollections of certain details and, most significantly, substantial, independent corroboration persuade the court that DeLeo's rendition of events is truthful.

As described earlier, Zalkind represented both Goldman and Mondello at the 1977 trial.  He was at the time a former prosecutor.  Mar. 18, 2008 Tr. at 20 (Test. of Zalkind).  Zalkind remains a defense attorney.  Id. at 19.  He has no motive to lie in this matter.

Zalkind truthfully testified that DeLeo attended several of his pretrial meetings with Goldman in 1977.  Id. at 38, 41, 46,

104

58-60, 74.   In 1977, DeLeo told Zalkind that he was involved in the purported kidnapping of Lopes and that the kidnapping was a hoax.   Id. at 41-42, 46, 58-60.   In 1977, DeLeo also advised Zalkind that Goldman's only involvement was in dealing with the automobile after it broke down.   Id. at 60.   Zalkind confirmed that DeLeo briefly came to the 1977 trial.   Id. at 61.

Mondello was another credible witness on the matters that are material to whether Goldman was criminally involved in the purported kidnapping of Lopes.   In the 1970's Mondello and Goldman were close friends and committed crimes together.   Mar. 18, 2008 Tr. at 150-52.   Mondello still regards Goldman as a friend.   Id. at 152.   However, prior to testifying in this matter, Mondello had not seen Goldman since the 1970's.   Id. at 150, 181.   While previously a person who would have readily lied, many years ago Mondello had a genuine epiphany and has become deeply religious.   Id. at 130, 148-49.   Holding up one of the several large crosses that he regularly wears, Mondello credibly explained that God is now his "Boss" and it would be a "grave sin" for him to lie under oath.   Id. at 130, 183, 184.   Although his memory was not good on some points, he was clear, consistent, and unequivocal in exculpating Goldman and confirming DeLeo's version of events.

More specifically, Mondello credibly testified that the purported kidnapping of Lopes was a hoax. _See_ _id._ at 112-13, 120. The three men who took Lopes from the Stadium Cafe were DeLeo, Larkin, and Mondello. _Id._ at 111.   Mondello understood that Brower, the attorney who later represented Larkin at the 1977 trial, had developed the phony kidnapping scheme. _Id._ at 112-13.   Goldman was not involved in it. _Id._ at 111.   However, when the vehicle in which Lopes, DeLeo, Larkin and Mondello were traveling broke down in the sudden snowstorm, _id._ at 116-17, Mondello called his friend Goldman, who agreed to arrange to get it towed and repaired. _Id._ at 122, 132-33.

Testimony from O'Boy, the 1977 prosecutor, also supported many aspects of DeLeo's version of the 1977 events.   O'Boy testified that Brower was an attorney with questionable ethics, Mar. 5, 2008 Tr. at 70, 76 (Test. of O'Boy), who O'Boy knew at the time to have been associated with La Cosa Nostra Boss Raymond Patriarca, _id._ at 75.   In addition, O'Boy testified that in 1991, when he was no longer a prosecutor, he ran into Goldman on the street in Boston and Goldman told him that the 1977 kidnapping case had arisen because Lopes had robbed a high stakes card game and individuals were sent to get the money back. _Id._ at 14-15,

106

17.[23]

The court recognizes that Goldman is deeply interested in this matter and, therefore, has been skeptical about his testimony.  However, Goldman's claim that he was not involved in the purported kidnapping of Lopes and only assisted Mondello with the disabled vehicle has proven to be credible.[24]  As described,

_____

[23] O'Boy had no recollection of whether Goldman, during the 1991 exchange, said "we" or "they" were sent to get the money from Lopes.  Id. at 14-15.  Goldman testified that he did not say to O'Boy that he was involved.  Mar. 19, 2008 Tr. at 76-77.  The court finds that Goldman did not say "we" were sent to get the money back and thus confess any criminal involvement in the Lopes matter.  Rather, he was describing the background, as he understood it, of the purported kidnapping of Lopes by others in which he was not involved.

[24] The court recognizes that in 1976 Goldman evidently was inaccurate, and perhaps intentionally not truthful, when he represented at trial and to his federal Probation Officer that he was working at a Budweiser facility on November 24, 1975.

This District Court's Probation records indicate that Zalkind represented to Probation on Goldman's behalf at a March 23, 1976 hearing that on November 24, 1975, the day of the kidnapping, Goldman had been fired from his job at Seawood in Malden, and then immediately (that day) applied for a job at Anheuser Busch.  Ex. 25, at 2.  Goldman and Zalkind confirmed that his defense of the kidnapping charges included a claim that he had been working at Budweiser on the day of the kidnapping.  See Mar. 19, 2008 Tr. at 61 (Test. of Goldman); Mar. 18, 2008 Tr. at 51 (Test. of Zalkind).

However, other Probation records note that on November 28, 1975, Goldman told his Probation Officer that he had been fired from his Seawood job, but did not mention working at Budweiser or Anheuser Busch.  Ex. 35 (Probation Chron. Record) at 1.  Instead, Goldman mentioned that he was attempting to open a plant shop.  Id.  In addition, on December 7, 1976, according to Probation records, Goldman told his Probation Officer that he had been working at Anheuser Busch, Inc. in Cambridge since "after

previously, the evidence presented by DeLeo, Zalkind, and Mondello, none of whom testified at the 1977 trial, confirm Goldman's account. The court finds that none of these witnesses communicated about their testimony in these proceedings.

As described earlier, Goldman attempted to appeal his 1977 conviction when his concurrent sentence had no consequences. After the enhancement of his 1993 federal sentence as a result of the 1977 conviction, Goldman promptly tried to get a series of lawyers to file a motion to vacate it. Therefore, Goldman's current contention that he is innocent of the purported Lopes' kidnapping is not a mere recent contrivance.

In summary, the court presumes that Lopes identified Goldman as one of his kidnappers and several witnesses identified him as dealing with the disabled vehicle. However, even the prosecutor, O'Boy, characterized Lopes as a "despicable" person and,

---

Thanksgiving."  Ex. 35 at 3.  Thanksgiving in 1975 fell on Thursday, November 27, 1975.  Ex. 26 (Presidential Proclamation No. 4405).

Therefore, to the extent that Goldman's defense at his 1977 trial was that he was working at Budweiser at the time of the purported Lopes kidnapping, the alibi evidence presented was inaccurate or intentionally false.  However, there is nevertheless clear and convincing credible evidence that Goldman was not involved in the purported kidnapping and was only called by Mondello to deal with the disabled vehicle.  If Goldman was lying at his 1977 trial, the court infers that it was to protect DeLeo, who had told Goldman "not to worry."  Mar. 3, 2008 Tr. at 49 (Test. of DeLeo).

therefore, the court infers Lopes was an impeachable witness. According to the police reports, nobody identified Goldman as being at the Stadium Cafe or Carlton House.  Goldman was not arrested where the ransom money was to be left, had not rented any of the vehicles involved, and his fingerprints were not found at any relevant place.  Most significantly, DeLeo credibly testified that he was the third person involved in the purported kidnapping of Lopes.  Zalkind and Mondello credibly confirmed the key aspects of DeLeo's testimony.  Mondello and Goldman testified that Mondello called Goldman and asked him to assist with the disabled vehicle.  The testimony of the garage operators who identified Goldman is completely consistent with Mondello and Goldman's accounts.

Merely dealing with the disabled vehicle is not enough to make Goldman a coconspirator. <u>See</u> First Circuit Pattern Criminal Jury Instructions §4.18.371(1) (conspiracy requires that the defendant "wilfully join[] in the agreement" to commit the substantive crime charged, and that "a person who has no knowledge of a conspiracy, but simply happens to act in a way that furthers some object or purpose of the conspiracy, does not thereby become a conspirator").  Under Massachusetts law, to be liable for a substantive crime under co-conspirator or joint

venturer liability, a defendant must share the specific intent that a crime be committed and either be present at the scene and agree to provide aid or actually participate in the commission of the crime. See Commonwealth v. Camerano, 677 N.E.2d 678, (Mass. App. Ct. 1997) ("Intent is a requisite mental state for conspiracy, not mere knowledge or acquiescence." (citing, inter alia, Commonwealth v. Beneficial Finance Co., 275 N.E.2d 33, 69 (Mass. 1971))); Commonwealth v. Richards, 293 N.E.2d 854, 860 (Mass. 1973) (noting that guilt on an accessory theory under Massachusetts law requires proof that the defendant "intentionally assisted the principal in the commission of the crime and that he did this, sharing with the principal the mental state required for that crime"); Commonwealth v. Funches, 397 N.E.2d 1097, 1104 (Mass. 1979) (finding evidence that defendant knew the perpetrators of a crime and was present near the crime was insufficient to support the inferences of intent and participation necessary to support joint venture liability).

In its closing argument in this case, the government for the first time suggested that Goldman may have joined the conspiracy after going to the gas station in Brockton to ask that the disabled vehicle be towed. See Mar. 20, 2008 Tr. at 151. In support, the government explained that the gas station operator

who spoke, on November 24, 1975, to a man he later identified as Goldman stated that after speaking to him, the man "ran across Belmont Street to the Carlton House." Ex. 2 at 36. As further evidence that Goldman joined the alleged conspiracy at this point, the government notes that Lopes told police that when he left the Carlton House, blindfolded in a vehicle, "it seemed as though there were four (4) men now instead of the original three (3)." Ex. 3 at 4.

However, the government's belated theory of Goldman's guilt is not persuasive. As described earlier, DeLeo credibly explained that the fourth person in the vehicle with Lopes when the group left the Carlton House was Lisa, Larkin's girlfriend who had picked the party up at the Carlton House. Mar. 19, 2008 Tr. at 16-17; Mar. 3, 2008 Tr. at 26.

In addition, the gas station operator did not identify the time at which he met Goldman. There is no evidence that the kidnappers were still at the Carlton House when Goldman arrived at the gas station and then walked or ran toward it. Nor did anyone in the Carlton House identify Goldman. Again, the waitress in the lounge and the desk attendant reported seeing only two men escorting Lopes. See Ex. 2 at 35-36. In addition, the kidnapping was investigated by police as having involved

111

three men, as demonstrated by the apparent conclusion of the
investigation after the arrests of Larkin, Mondello, and Goldman.
Given this evidence, the court is persuaded that Goldman did not
join the conspiracy at the Carlton House and no reasonable juror
could find that he did.

In view of the foregoing, Goldman has demonstrated by clear
and convincing new and trustworthy evidence that no fully
informed juror would have found beyond a reasonable doubt that he
was guilty of the purported kidnapping of Lopes.

IV.  CONCLUSION

Accordingly, Goldman has demonstrated "that he is actually
innocent of the act on which his harsher sentence was based."
<u>Spence</u>, 219 F.3d at 172.  Therefore, he has demonstrated that the
additional seventeen to twenty years to which he was sentenced in
federal court in 1993 because of his 1977 state conviction
represents a genuine "miscarriage of justice."  <u>See</u> <u>id.</u>; <u>Dretke</u>,
541 U.S. at 398 (Stevens, J., dissenting on other grounds).
These showings overcome the procedural default that would
otherwise prevent this court from considering Goldman's claim for
relief under §2241, <u>see</u> <u>Oakes</u>, 400 F.3d at 95; <u>Dretke</u>, 541 U.S.
at 393, and provide him a right to review and possible relief
pursuant to it.  <u>See</u> <u>Barrett</u>, 178 F.3d at 57.  Because a

conviction essential to Goldman's Career Offender classification has been vacated based on serious constitutional and legal errors at his 1977 trial, this court finds Goldman's claim for relief under §2241 to be meritorious, as it would be under §2255 if it were available to him.  See Mateo, 398 F.3d at 133, 134 & nn.6-7; cf. Hill, 368 U.S. at 428 (§§2241 and 2255 are intended to provide exactly the same remedies).  Therefore, Goldman has proven that he is entitled to be resentenced without regard to that conviction.

As indicated at the outset of this Memorandum, the court understands that without the enhancement for being a Career Offender, under the Sentencing Guidelines Goldman's Total Offense Level would have been 30, his Criminal History category would have been III, and the Guideline range for his sentence would have been 121 to 151 months.  If Goldman had been sentenced to 121 months in custody he would have been released no later than August 15, 2002.  If he had been sentenced to 151 months in custody, he would have been released no later than February 15, 2005.  Thus, it appears that the miscarriage of justice that led to Goldman being sentenced to 360 months in prison has already caused him to serve three to six extra years in prison.

Therefore, the court expects to resentence Goldman to Time

113

Served, which would entitle Goldman to immediate release. However, the court will provide the parties an opportunity to brief before the resentencing hearing the issue of whether that order should be stayed pending appeal if the government so requests.   See Ferrara v. United States, 370 F. Supp. 2d 351 (D. Mass. 2005).

V.    ORDER

In view of the foregoing, it is hereby ORDERED that:

1.    Petitioner Franklin Goldman's Petition for Habeas Corpus Pursuant to 28 U.S.C. §2241 (Docket No. 1) is ALLOWED.

2.    A hearing at which Goldman shall be resentenced for his 1993 convictions for conspiracy to possess cocaine with intent to distribute and possession of cocaine with intent to distribute shall be held on August 7, 2008, at 11:00 a.m.   The court expects to resentence Goldman to Time Served.

3.    If the government wishes to request a stay of Goldman's release pending appeal, it shall by July 16, 2008 file a motion and supporting memorandum.   Goldman shall respond by July 28, 2008.   Any reply shall be filed by August 4, 2008.


                                   /s/ Mark L. Wolf
                            UNITED STATES DISTRICT JUDGE

114